NATURAL RESOURCES DEFENSE
COUNCIL and Center for Auto
Safety, Petitioners,

v.

William K. REILLY, Administrator, United States Environmental Protection Agency, and United States Environmental Protection Agency, Respondents,

Association of International Automobile Manufacturers, Inc., Motor Vehicle Manufacturers Association of the United States, Inc., Intervenors,

EAST COAST OIL CORPORATION and
Sheetz, Incorporated, Petitioners,

v.

William K. REILLY, in His Capacity as Administrator of the United States Environmental Protection Agency, Respondent,

Association of International Automobile Manufacturers, Inc., Motor Vehicle Manufacturers Association of the United States, Inc., Intervenors,

AMERICAN PETROLEUM INSTITUTE,
Petitioner,

v.

William K. REILLY, Administrator, United States Environmental Protection Agency, and United States Environmental Protection Agency, Respondents,

NATURAL RESOURCES DEFENSE
COUNCIL and Center for Auto
Safety, Petitioners,

v.

William K. REILLY, Administrator, United States Environmental Protection Agency, and United States Environmental Protection Agency, Respondents,

EAST COAST OIL CORPORATION and
Sheetz, Incorporated, Petitioners,

v.

William K. REILLY, Administrator, in His Capacity as Administrator of the United States Environmental Protection Agency, Respondent,

AMERICAN PETROLEUM INSTITUTE,
Petitioner,

v.

William K. REILLY, Administrator, United States Environmental Protection Agency, and United States Environmental Protection Agency, Respondents.

Nos. 92–1137, 92–1142, 92–1157,
92–1222, 92–1260, 92–1243.

United States Court of Appeals,
District of Columbia Circuit.

Argued Nov. 23, 1992.

Decided Jan. 22, 1993.

Howard I. Fox, with whom David D. Doniger, Michael D. Sherman, J. Keith Ausbrook, Douglas Morris and Alice Crowe, Washington, DC, were on the brief, for petitioners.

David J. Kaplan, Atty., U.S. Dept. of Justice, with whom Alan W. Eckert, Associate Gen. Counsel, Nancy Ketcham–Colwill, Asst. Gen. Counsel, and Steven E. Silverman, Atty., Office of Gen. Counsel, U.S.E.P.A., Washington, DC, were on the brief, for respondents.

Charles H. Lockwood and John T. Whatley, Arlington, VA, entered an appearance for intervenor, Ass'n of Intern. Auto. Mfrs., Inc.

Kenneth S. Geller, Erika Z. Jones, Evan M. Tager, Washington, DC, and William Crabtree entered an appearance for intervenor, Motor Vehicle Mfrs. Ass'n of the U.S. Inc.

Before HARRY T. EDWARDS, RUTH BADER GINSBURG and STEPHEN F. WILLIAMS, Circuit Judges.

Opinion for the Court filed by Circuit Judge HARRY T. EDWARDS.

Concurring opinion filed by Circuit Judge STEPHEN F. WILLIAMS.

HARRY T. EDWARDS, Circuit Judge:

The 1990 amendments to the Clean Air Act ("CAA") altered section 202(a)(6) to require the Environmental Protection Agency ("EPA"), after "consultation" with the Department of Transportation ("DOT"), to promulgate standards by November 15, 1991, that would require new "light-duty" vehicles [1] to be equipped with on-board refueling vapor recovery ("ORVR") systems over a specified phase-in period. After consulting with DOT, EPA concluded that the safety risks of ORVR systems were unreasonable given the availability of alternative mechanisms for controlling refueling vapor emissions and declined to promulgate ORVR standards by the statutory deadline. This decision was Noticed as a Final Agency Action in April, 1992. 57 Fed.Reg. 13,046 (1992). In explaining its decision, EPA contended that amended section 202(a)(6) contained residual authority for EPA to exercise discretion in deciding whether to promulgate ORVR standards if the Agency determined that ORVR was unreasonably unsafe. The Natural Resources Defense Council ("NRDC") initiated this suit, alleging that EPA lacked discretion under the statute and that its failure to promulgate ORVR standards was therefore unlawful.

Because the language of section 202(a)(6) plainly imposes a mandatory duty, we agree that EPA's decision not to promulgate ORVR standards was beyond the pale of its statutory authority. There is nothing in the statute to substantiate EPA's claim for residual discretionary authority, nor is there ambiguity that would warrant deference by this court to EPA's construction. Furthermore, EPA's findings regarding ORVR safety do not establish that all such systems present inherent and unreasonable safety risks. We are thus not faced with a situation in which a literal reading of the section produces nonsensical results. Whatever doubts EPA may have about the wisdom of choices implicit in the statute must be raised with Congress. This court is not the proper forum in which to argue the relative merits of those choices. Therefore, the Final Agency Action is set aside and EPA is ordered to promulgate ORVR standards in compliance with the CAA.

I. BACKGROUND

A. *The "Refueling Vapor Recovery" Problem*

During the normal operation of gasoline fueled vehicles, hydrocarbon vapors build up in the fuel tank. When the fill cap is removed during refueling, most of these vapors are forced out of the tank and into the environment by the influx of liquid gasoline. This release of vapors poses significant health and environmental hazards. Of primary concern is the effect these vapors have on the production of ozone, which is formed when hydrocarbons and nitrogen oxides react in sunlight.[2] Excessive ozone pollution is a persistent environmental hazard in major metropolitan areas. *See* Air Quality Designations and Classifications, 56 Fed.Reg. 56,694 (1991) (designating nonattainment areas for ozone pollution). In addition, escaping gasoline vapors contain known carcinogens.[3] Thus, the control and containment of these vapors has been an environmental concern for many years.

---

**1.** Light-duty vehicles include passenger cars and light trucks capable of seating 12 or fewer passengers. 40 C.F.R. § 86.082–2 (1992).

**2.** EPA has established National Ambient Air Quality Standards ("NAAQS") for six pollutants, including ozone. *See* 40 C.F.R. § 50.9 (1992). Those areas in which ozone NAAQS have not been attained ("nonattainment" areas) are classified either as "Marginal," "Moderate," "Serious," "Severe," or "Extreme" depending on the severity of the ozone pollution in those areas. *See* 42 U.S.C. § 7511a (Supp.1990).

**3.** EPA has concluded that benzene, a normal constituent of gasoline and gasoline vapors, is a human carcinogen. 52 Fed.Reg. 31,162, 31,168 (1987). Epidemiological and animal studies indicate that exposure to benzene results in an increase in leukemia. Moreover, animal studies with fuel vapors have demonstrated a significant increase in kidney cancer among male rats and liver cancer in female mice. *Id.* at 31,168–69. Therefore, EPA has concluded that gasoline vapors are a probable human carcinogen under EPA's Cancer Risk Assessment Guidelines. *Id.* at 31,164.

Two basic approaches have emerged for controlling the emission of hydrocarbon vapors during refueling: "Stage II" controls [4] and ORVR systems. Stage II controls— typically a rubber boot on the fuel nozzle that creates a tight seal with the fuel filler spout so that escaping vapors are recaptured and funneled to underground tanks— are relatively simple mechanisms that have been used since 1976 in many counties in California as well as certain cities in the United States. *See* DOT, Assessment of the Safety of Onboard Refueling Vapor Recovery Systems at 3 (July 1991) [*hereinafter* "DOT Assessment"]. Under the current CAA, Stage II controls are required in most nonattainment areas of moderate or worse severity. *See* 42 U.S.C. §§ 7511a(b)(3), (c), (d), (e) (Supp.1990).

ORVR systems, on the other hand, are more sophisticated and have not yet been used in production vehicles. As the name implies, onboard refueling vapor recovery systems are built into the vehicle itself to contain the vapors before they reach the fuel filler spout. There are presently two types of technology that have been seriously considered for operational ORVR systems. The first is the ORVR "canister," which collects vapors as they are forced through a regulating orifice and stores them in a charcoal-filled canister. *See* DOT Assessment at 1. As the engine operates, ambient air is drawn through the canister to purge the hydrocarbons from the charcoal and meter the vapors back into the engine for combustion ("purging"). *See id.*[5] Canister systems are more fully evolved than other ORVR systems because virtually all of the necessary technology for canister systems is currently available. Indeed, most passenger cars on the road today already carry a small charcoal filled canister (so called "evaporative canisters")

to collect the relatively modest quantities of vapor that accumulate in fuel tanks during operations other than refueling. It was, in fact, modified versions of current evaporative canisters that the National Highway Transportation Safety Administration ("NHTSA") studied in order to provide EPA with DOT's recommendations regarding the safety of ORVR. *Id.* at 2.

An alternative to ORVR canisters is the flexible fuel bladder, which contracts as gasoline is burned, retarding the evaporation of liquid fuel and thus the accumulation of hydrocarbon vapors. Because of potential safety benefits from such a system, aside from the environmental protection it would provide, the possibility of using flexible fuel bladders has been explored for many years. *See, e.g.,* Memorandum from Jean Schwendeman, EPA Mechanical Engineer, to Public Docket No. A–87–11 (Mar. 1, 1988) (memorializing a meeting with a manufacturer that had been testing fuel bladders since "the early 1970's") [*hereinafter* "Schwendeman Memo"], *reprinted in* J.A. at 524. Nonetheless, no bladder prototypes were available at the time NHTSA conducted its study. *See* DOT, Review of Comments Submitted to EPA on NHTSA's Report "An Assessment of the Safety of Onboard Refueling Vapor Recovery Systems" at 4 (Nov. 27, 1991) [*hereinafter* "DOT Review"], *reprinted in* J.A. at 163.

B. *Legislative and Regulatory Responses to the "Refueling Vapor Recovery" Problem*

Under the 1977 amendments to the CAA, EPA was required to promulgate ORVR regulations if it found ORVR to be a feasible and desirable means of controlling vapor emissions during refueling. Pub.L.

---

**4.** Refueling operations at service stations involve two steps: the filling of underground storage tanks, commonly called stage I; and vehicle refueling, commonly called stage II. *See* EPA, Evaluation of Air Pollution Regulatory Strategies for *Gasoline Marketing Industry*, EPA– 450/3–84–012a at 1–5 (July 1984).

**5.** Under normal operating conditions, nearly all of the vapors should be purged from a saturated ORVR canister within the first eleven to twenty-eight miles of travel after refueling. *See* Comments of the American Petroleum Institute Concerning EPA's Proposed Regulation of Refueling Emissions, Docket No. A–87–11 (Oct. 25, 1991)

No. 95–95, § 216, 91 Stat. 760–61 (1977).[6] Upon review of the information available to it in the late 1970's, EPA initially concluded that ORVR was "technically feasible." *See* 52 Fed.Reg. at 31,163 (describing conclusions reached in 1980). However, in order to avoid placing additional regulatory burdens on the ailing American automotive industry, EPA decided not to require ORVR systems at that time. *See* 46 Fed. Reg. 21,628, 21,629 (1981).

In 1984, EPA again took up the ORVR issue in a draft study entitled "Evaluation of Air Pollution Strategies for Gasoline Marketing Industry," EPA–450/3–84–012a (July 1984). *See* 49 Fed.Reg. 31,706, 31,707 (1984) (announcing the public availability of the study). After thorough reconsideration, EPA concluded that ORVR was the preferred control technology and proceeded to detail proposed regulations for the implementation of mandatory ORVR. 52 Fed. Reg. at 31,162. In that same Federal Register Notice, EPA addressed the technical difficulties associated with a practical ORVR system. EPA concluded that ORVR was generally safe and that approximately two years of lead time would be sufficient for manufacturers to install ORVR in new models since most of the technology was already available. 52 Fed. Reg. at 31,202–03.

Researchers at NHTSA had a somewhat different view of the situation, for they had continuing concerns that ORVR would lead to an increase in crash and non-crash vehicle fires.[7] *See* 57 Fed.Reg. 13,220 (1992). Thus, before promulgating a final rule, EPA initiated further dialogue with NHTSA in order to address these issues.

NHTSA's concerns stemmed primarily from its view that ORVR would increase the complexity of fuel systems and concomitantly the risk of fire. EPA specifically responded to this concern in its 1988 draft report on the safety of ORVR. First, EPA challenged NHTSA's underlying assumption that there is a positive correlation between increased complexity and increased risk. EPA noted that the increasing design complexity of automobiles without significant safety degradation "strongly suggests that onboard systems of various design complexities could also be implemented safely." EPA Draft "Summary & Analysis of Comments Regarding Potential Safety Implications of Onboard Vapor Recovery Systems" at 3–35 (Aug. 1988) [*hereinafter* "EPA Draft"], *reprinted in* J.A. at 78. Second, even assuming that added complexity means added safety risk, EPA determined that ORVR systems need not be overly complex. According to the draft report, ORVR canister systems could be devised that would be simple extensions of present evaporative systems. *See id.* at 3–40. Thus, EPA found that "straightforward, reliable, and relatively inexpensive

at 49 [*hereinafter* "API Comments"], *reprinted in* Joint Appendix ("J.A.") at 252.

6. Specifically, former section 202(a)(6) provided:

The Administrator shall determine the feasibility and desirability of requiring new motor vehicles to utilize onboard hydrocarbon control technology which would avoid the necessity of gasoline vapor recovery of uncontrolled emissions emanating from the fueling of motor vehicles. The Administrator shall compare the costs and effectiveness of such technology to that of implementing and maintaining vapor recovery systems (taking into consideration such factors as fuel economy, economic costs of such technology, administrative burdens, and equitable distribution of costs). If the Administrator finds that it is feasible and desirable to employ such technol-

ogy, he shall, after consultation with the Secretary of Transportation with respect to motor vehicle safety, prescribe, by regulation, standards requiring the use of onboard hydrocarbon technology which shall not become effective until the introduction to the model year for which it would be feasible to implement such standards, taking into consideration compliance costs and the restraints of an adequate lead time for design and production.

7. There are approximately 28,800 fires annually resulting from the crash of a passenger car or light truck. DOT Assessment at 14. Data assembled by NHTSA indicate that vehicle occupants are two to four times more likely to be injured in crashes involving a fire than in non-fire crashes. *Id.* at 9. Moreover, the fatality rate in crashes involving fires is 70–80% greater than in non-fire crashes. *Id.*

engineering solutions exist for each of the potential problems identified." *Id.*

In order to test this conclusion, EPA constructed a simple ORVR canister system and installed it in a test vehicle. *Id.* at 5–6. This vehicle adequately performed under limited testing conditions, leading EPA to summarize the experiment as follows:

> Onboard systems can be simple extensions or modifications of present evaporative systems. Further, modifications that are necessary can even simplify certain aspects of the current design. With the proper design, no risk need be added, and in fact, refueling controls can offer several safety benefits.

*Id.* at 5–7. To further assess the safety of proposed ORVR systems, EPA contracted with an outside firm to complete an independent study. In September, 1988, after reviewing the risk of vehicle fire for ten different fuel system designs, the Battelle Institute's Transportation Safety Group concluded that the risk of fire was remote in all cases and that it would not be significantly impacted by the installation of ORVR. *See* EPA, Refueling Emission Controls: A Briefing for the National Highway Transportation Safety Administration at 25 (Apr. 21, 1989) [*hereinafter* "EPA Briefing"], *reprinted in* J.A. at 132.

During this period, EPA was also receiving further input from NHTSA. In October, 1988, NHTSA submitted its analysis of EPA's draft report as well as an analysis of the public comments EPA had received as a result of its proposed ORVR regulations. First, NHTSA reiterated that increased design complexity in fuel systems tends to result in greater fire risk. *See* DOT, Comments on the August 1988 EPA Draft at 9 (Oct.1988), *reprinted in* J.A. at 505. In addition, NHTSA discounted the value of the tests done with the EPA prototype ORVR canister system since EPA neglected to account for certain problems that would arise under actual operating conditions, such as fuel leakage and lack of "drivability" (e.g., engine stalls and hesitation during acceleration). *See id.* at 10. Thus, NHTSA contended that ORVR would add complexity to the system and increase, by an unquantified amount, safety hazards. *Id.* at 9. After reviewing NHTSA's assessment, and in view of imminent amendments to the CAA, EPA declined to issue final rules requiring ORVR systems. *See* 57 Fed.Reg. at 13,220.

In 1990, Congress again amended the CAA, this time establishing a comprehensive framework for controlling refueling emissions. Under sections 182(b)(3), (c), (d), and (e), Stage II controls are required in moderate, serious, severe, and extreme nonattainment areas. 42 U.S.C. § 7511a (Supp.1990). Amended section 202(a)(6) of the CAA now mandates that EPA, after consultation with DOT regarding safety, *shall* promulgate standards for ORVR by November 15, 1991.[8] Pursuant to this stat-

---

8. Section 202(a)(6) reads in full:

(6) Onboard Vapor Recovery—Within 1 year after November 15, 1990, the Administrator shall, after consultation with the Secretary of Transportation regarding the safety of vehicle-based ("onboard") systems for the control of vehicle refueling emissions, promulgate standards under this section requiring that new light-duty vehicles manufactured beginning in the fourth model year after the model year in which the standards are promulgated and thereafter shall be equipped with such systems. The standards required under this paragraph shall apply to a percentage of each manufacturer's fleet of new light-duty vehicles beginning with the fourth model year after the model year in which the standards are promulgated. The percentage shall be as specified in the following table:

**IMPLEMENTATION SCHEDULE FOR ONBOARD VAPOR RECOVERY REQUIREMENTS**

| Model year commencing after standards promulgated | Percentage |
| --- | --- |
| Fourth | 40 |
| Fifth | 80 |
| After fifth | 100 |

Percentages in the table refer to a percentage of the manufacturer's sales volume.

The standards shall require that such systems provide a minimum evaporative emission capture efficiency of 95 percent. The requirements of section 7511a(b)(3) of this title (relating to stage II gasoline vapor recovery) for areas classified under section 7511 of

utory mandate, EPA reinitiated consultation with DOT, through NHTSA. NHTSA then embarked upon a further review of ORVR canister safety. Since actual ORVR systems were proprietary and not available for independent testing, NHTSA used components of, and data pertaining to, current evaporative systems to reach its conclusions. DOT Assessment at 11. NHTSA acknowledged that, because of availability problems, it did not consider or evaluate ORVR systems other than canisters. *See* DOT Review at 4.

NHTSA's final report was submitted to EPA in July, 1991. The report identified potential failure points of an ORVR canister system during operation. DOT Assessment at 7–8. However, this analysis was premised on four critical and unproven assumptions about ORVR canister systems. First, since ORVR systems will store more vapors than existing evaporative canisters, NHTSA hypothesized that the fire hazard posed by larger ORVR canisters would be greater than that of existing canisters. *Id.* at 3. Second, NHTSA speculated that the quantity of vapors being moved through the system during refueling will be large compared to that which passes through current evaporative systems. *Id.* at 9. Third, NHTSA assumed that the complexity of the ORVR canister system will be greater than present systems, thus increasing the possibility of component failure. *Id.* Finally, NHTSA contended that the increased quantity of fuel vapor being carried in the vehicle at any given time will lead to a greater chance of fire in the event of a crash in which canister integrity is lost and the contents of the canister are exposed to an ignition source. *Id.* Based on these assumptions, NHTSA concluded that:

> Under certain conditions representative of the motor vehicle crash and operating environment, ORVR refueling vapor recovery systems would result in a substantial increase in fire potential. These occurrences result in an increased safety risk and hence would have a negative impact on safety.

*Id.* at 10. Although NHTSA maintained that the testing conditions it used simulated real world environments, it recognized that the occurrence of these conditions would be unlikely. *Id.* at 11.

After publication of the study, EPA requested public comment on NHTSA's findings and conclusions. *See* 56 Fed.Reg. 43,-682–83 (1991). In late September, a public hearing on the matter was held in which both EPA and NHTSA officials participated. *See* 57 Fed.Reg. at 13,221. EPA then asked NHTSA to review the presentations made at the hearing and to respond to public comments. NHTSA's technical evaluation, which followed on November 27, concluded:

> On this issue, the record is clear and unambiguous. Implementation of ORVR, regardless of prototype development and technological evolution, will increase safety risks. ORVR systems will require additional components and must manage, store, and transport larger quantities of flammable fuel vapor.... Thus, further technology development and operational successes or failures of prototype vehicles will not eliminate the fundamental safety issues associated with ORVR systems.
>
> ....
>
> NHTSA considers these risks to be inherent. We [NHTSA] believe that no amount of product development or engineering and quality control measures would fully alleviate these risks, regardless of lead time.

DOT Review at 4–5.

While this evaluation process was being completed, the November 15, 1991 deadline for the promulgation of ORVR standards passed without EPA action. Alleging that EPA had failed to abide by the statutory

this title as moderate for ozone shall not apply after promulgation of such standards and the Administrator may, by rule, revise or waive the application of the requirements of such section 7511a(b)(3) of this title for areas classified under section 7511 of this title as Serious, Severe, or Extreme for ozone, as appropriate, after such time as the Administrator determines that onboard emissions control systems required under this paragraph are in widespread use throughout the motor vehicle fleet.

42 U.S.C. § 7521(a)(6) (Supp.1990).

mandate in section 202(a)(6), NRDC filed suit in the Eastern District of Virginia under section 304(a) of the CAA. *See Natural Resources Defense Council v. Reilly,* 788 F.Supp. 268 (E.D.Va.1992). Before the case could be concluded, however, EPA issued a Notice of Final Agency Action in which it determined that the safety risks of onboard systems outweighed the environmental benefits of such devices and that it would not, therefore, promulgate standards pursuant to section 202(a)(6). *See* 57 Fed. Reg. at 13,220–31. Noting that section 307(b)(1) of the CAA confers exclusive jurisdiction on the United States Court of Appeals for the District of Columbia Circuit to review Final Agency Action, the district court dismissed the case without prejudice. *NRDC v. Reilly,* 788 F.Supp. at 273–74. That decision has been appealed to the Fourth Circuit, which is holding the case in abeyance pending the outcome in this case. *NRDC v. Reilly,* No. 92–1534 (4th Cir. 1992).

## II. DISCUSSION

The principal dispute in this case involves EPA's interpretation of section 202(a)(6) of the CAA. NRDC contends that the section contains an unambiguous requirement that EPA promulgate standards for ORVR systems. EPA, on the other hand, sees the "consultation" requirement contained in section 202(a)(6) as the last vestige of discretion permitted the Agency. In particular, the Agency argues that Congress did not intend that EPA promulgate ORVR standards if it found the systems to be inherently and unreasonably unsafe.

Since EPA is charged with administering the CAA, NRDC's challenge to its construction of this provision must be reviewed using the analysis provided by the Supreme Court in *Chevron USA, Inc. v. Natural Resources Defense Council, Inc.,* 467 U.S. 837, 104 S.Ct. 2778, 81 L.Ed.2d 694 (1984).

If, under the first prong of [the] *Chevron* analysis, we can determine congressional intent by using "traditional tools of statutory construction," then that interpretation must be given effect. [*NLRB v.*] *United Food & Commercial Workers,* 484 U.S. [112] at 123 [108 S.Ct.

413 at 420, 98 L.Ed.2d 429] (1987). If, on the other hand, "the statute is silent or ambiguous with respect to the specific issue," then we will defer to a "permissible" agency construction of the statute. *Chevron,* 467 U.S. at 843, 104 S.Ct. at 2782.

\* \* \* \* \* \*

[I]t is only legislative intent to delegate such authority that entitles an agency to advance its own statutory construction for review under the deferential second prong of *Chevron. See Chevron,* 467 U.S. at 843–44, 104 S.Ct. at 2781–82. "If Congress has explicitly left a gap for the agency to fill, there is an express delegation of authority.... Sometimes the legislative delegation to an agency on a particular question is implicit rather than explicit. In such a case, a court may not substitute its own construction of a statutory provision for a reasonable interpretation made by the administrator of an agency." *Id.*

*Kansas City v. Department of Housing & Urban Dev.,* 923 F.2d 188, 191–92 (D.C.Cir. 1991).

Given the plain and unmistakable language of section 202(a)(6), we need not proceed beyond the first step of the *Chevron* analysis. Section 202(a)(6) mandates that "within one year after November 15, 1990, the Administrator *shall* ... promulgate standards under this section requiring that new light duty vehicles ... shall be equipped with [ORVR] systems." 42 U.S.C. § 7521(a)(6) (Supp.1990) (emphasis added). In this case, the language of the relevant section most manifestly obligates EPA to promulgate standards for ORVR systems. *See Hewitt v. Helms,* 459 U.S. 460, 471, 103 S.Ct. 864, 871, 74 L.Ed.2d 675 (1983) ("shall" is "language of an unmistakably mandatory character"); *Her Majesty the Queen v. USEPA,* 912 F.2d 1525, 1533 (D.C.Cir.1990) ("shall" signals mandatory action).

Where the authors of the CAA intended to create a conditional duty, they used the familiar words of condition. *See, e.g.,* CAA

§ 112(d)(9) [9] ("No standard for radionuclide emissions ... is required ... under this section *if* the Administrator determines, by rule, and after consultation with the Nuclear Regulatory Commission, that the regulatory program established by the Nuclear Regulatory Commission ... provides an ample margin of safety to protect the public health.") (emphasis added); CAA § 110(c)(1) [10] ("The Administrator shall promulgate a Federal implementation plan at any time within the 2 years after the Administrator ... disapproves a State implementation plan submission in whole or in part, *unless* the State corrects the deficiency, and the Administrator approves the plan or revision, before the Administrator promulgates such Federal implementation plan.") (emphasis added). No such words of condition are found in the consultation requirement of section 202(a)(6) that derogate from EPA's duty to promulgate ORVR standards. Therefore, EPA exceeded its statutory authority by declining to issue the standards.

Recognizing that its only hope of prevailing in this case is to reach the deferential second step of *Chevron*, EPA posits two facets of the legislation as evidence of ambiguity. However, neither argument undermines the congressional intention plainly evinced by the "shall promulgate" mandate of section 202(a)(6).

### A. *The Consultation Requirement*

■ First, EPA argues that although section 202(a)(6) imposes a mandatory duty, the scope of that duty is circumscribed by the requirement that EPA consult with DOT regarding ORVR safety. EPA argues that the section does not specify how the consultation requirement "meshes" with the duty to promulgate standards,

thus making the section at least ambiguous. We reject this argument because it is premised on a reading of "consultation" that would effectively result in DOT having a "veto" over any EPA action in compliance with the statutory duty to promulgate ORVR standards. This is a specious construction of the statute.

To begin with, the statute expressly provides that EPA *"shall"* promulgate standards *"after"* consultation with DOT, not "subject to" or "conditioned upon" that consultation.[11] Thus, no substantive result of the consultation is comprehended within the text that might vitiate EPA's mandatory duty to promulgate standards: no determination is required, no minimal standard for safety is articulated, and no particular measure or purpose of the consultation is specified. This does not mean that ORVR safety concerns will never be addressed. Sections 206(a)(3)(A) and 202(a)(4) of the Act provide for a later certification process to ensure that no system will be installed in an automobile for sale to the public unless it is safe. 42 U.S.C. §§ 7525(a)(3)(A), 7521(a)(4) (Supp.1990); *see also* 40 C.F.R. Part 86 (regulatory certification process and standards). However, this safety evaluation comes at a later stage in the implementation of emission control systems. It does not affect the duty to promulgate standards in the first instance.

Read in context, the central purpose of section 202(a)(6) is to impose regulatory standards for ORVR systems over a given and detailed time frame. Inserted parenthetically in this structure is a requirement that EPA consult with DOT regarding safety issues. Contrary to EPA's contention, the fact that the DOT consultation is merely advisory does not make it meaningless. At least two reasons for the requirement

---

**9.** 42 U.S.C. § 7412(d)(9) (Supp.1990).

**10.** 42 U.S.C. § 7410(c)(1) (Supp.1990).

**11.** EPA has referred us to snippets of the legislative history of the 1990 revisions to the CAA in support of its argument that the consultation requirement includes the authority to refuse to issue ORVR standards. *See, e.g.,* 136 Cong.Rec. at S18,038 (daily ed. Oct. 24, 1990) ("Summary of House–Senate Conference Agreement on the

Clean Air Act" submitted by Senator Baucus). The statements on which EPA relies are isolated and inconclusive; they surely cannot be read to cast doubt on the clear statutory language. In any event, these isolated statements are counterbalanced by statements indicating that the safety consultation requirement accords EPA no authority to withhold ORVR standards. *See, e.g.,* H.R.Rep. No. 490, 101st Cong., 2d Sess. pt. 1, at 303 (1990).

are apparent: first, the process might have been meant to provide EPA with a better awareness of various systems so that ORVR standards might accurately conform to imminently available technology; conversely, the process might allow EPA to structure standards that will promote the design and development of safer systems. In any event, as a matter of statutory construction, such a general consultation clause will not normally render nugatory other substantive requirements in a statute. *See, e.g., Natural Resources Defense Council v. Train,* 510 F.2d 692, 704 (D.C.Cir.1974) (consultation requirement in Federal Water Pollution Control Act did not undermine a mandatory duty). So here, too, we find that it does not call into question the express command of the section.

Further, the structure of current section 202(a)(6) stands in stark contrast with that of its predecessor, which required EPA to *determine the feasibility and desirability* of ORVR prior to promulgating ORVR standards. In the former section, it was necessary for EPA to determine that such systems were safe as a condition precedent to the promulgation of ORVR standards. Thus, it was implicit in that statutory scheme that EPA exercise discretion in deciding whether or not to implement regulations for ORVR systems. By deleting the determination requirement in the new section, Congress sent an unmistakable message that the consultation requirement is not to be used by EPA to avoid its obligation to promulgate standards for ORVR systems.

It is important to note that this is not a case in which EPA has made an irrefutable finding that *no* ORVR system could be developed in the foreseeable future that would be safe. Both EPA and NHTSA restricted their analysis of ORVR to charcoal canister systems similar to those used in present evaporative systems. 57 Fed. Reg. at 13,230. Both agencies rationalized this limitation by pointing out the embryonic nature of other ORVR technologies. *See* DOT Review at 4 (other technologies not available for evaluation); 57 Fed.Reg. at 13,230 (EPA did not consider "undeveloped technolog[ies]"). Yet, this narrow review is not defensible on the facts of this case.

First, the statute clearly calls for EPA to evaluate ORVR "systems." The use of the plural defeats any implication that Congress intended EPA to consider only ORVR *canister* technology. *Cf. Association of American Railroads v. Costle,* 562 F.2d 1310, 1315 (D.C.Cir.1977) (reference to "equipment and facilities" in Noise Control Act of 1972 encompasses *"all* such equipment and facilities") (emphasis in original); *Natural Resources Defense Council v. USEPA,* 915 F.2d 1314, 1320 (9th Cir.1990) (use of plural in Clean Water Act foreclosed EPA from restricting the scope of its duties).

We have previously noted a distinction between provisions in the CAA that are "technology-based" and those that are "absolute." *See Natural Resources Defense Council v. USEPA,* 655 F.2d 318, 322 & 332 n. 25 (D.C.Cir.1981). Technology-based provisions require EPA to promulgate standards only after finding that the requisite technology exists or may be feasibly developed. *Id.* at 322. Absolute standards, on the other hand, require compliance with statutorily prescribed standards and time tables, irrespective of present technologies. *Id.* Absolute standards presume that industry can be driven to develop the requisite technologies.[12] In this case, the use of the word "systems" in section 202(a)(6), in combination with the statutorily fixed time table, indicates that this provision falls into the "absolute" category and, hence, is technology-forcing. There is nothing in the

---

12. This results in the so called "technology-forcing" character of the CAA. *See Union Elec. Co. v. EPA,* 427 U.S. 246, 257, 96 S.Ct. 2518, 2525, 49 L.Ed.2d 474 (1976); *Natural Resources Defense Council v. Thomas,* 805 F.2d 410, 429 (D.C.Cir. 1986); *see also* 116 Cong.Rec. 42,381, 42,382 (1970) (claims of technological impossibility not sufficient to avoid standards under the CAA)

(comments of Senator Muskie). It is the nature of technology-forcing sections that technical problems, including those involving safety, are ironed out in the course of the statutorily spurred process of research and development. It is not necessary, or even anticipated, that required systems will be absolutely safe at the prototype stage of development.

section warranting EPA's decision to limit its consideration of ORVR to a single existing technology. Moreover, this statutory command was not, EPA's protestations to the contrary notwithstanding, unrealistic. While it is true that alternative control methods are not production-ready, several are beyond the conceptualization stage and should have been amenable to engineering evaluation.

For instance, vapor condensers and vapor combusters have been considered as alternatives to canister containment systems, and both were sufficiently developed to be the subject of investigation by auto manufacturers in 1988. EPA Draft at 3–3. Perhaps the most promising alternative to canisters are the previously mentioned flexible fuel bladders. The record indicates that this option has been extensively researched and that EPA had information in its possession four years ago tending to show that bladder systems could be production-ready within one or two years.[13] There is simply no basis for us to believe that Congress was not aware that flexible bladders represented a plausible alternative to charcoal canisters or that Congress did not intend for EPA to consider them in promulgating . ORVR standards. *See* S.Rep. No. 228, 101st Cong., 2d Sess. 94 (1990), U.S.Code Cong. & Admin.News 1990, 3385, 3479 (specifically noting flexible fuel bladder alternative); *see also* 52 Fed. Reg. at 31,175 (bladders recognized as an alternative in 1987); *id.* at 31,202 (bladders may improve fuel system safety). In addi-

tion, at least two other systems have been hypothesized which might eliminate or reduce many of the safety hazards that EPA perceived as attendant to ORVR canister systems. *See* U.S. Patent No. 4,880,135 (Nov. 14, 1989) (bellow tank); Memorandum from Karen Lostoski, Mechanical Engineer, EPA, to Public Docket No. A–87–11 (Sept. 9, 1988) (carbon cloth as a substitute for granulated activated carbon in ORVR canisters), *reprinted in* J.A. at 527.[14] Thus, in restricting its safety analysis to a single type of ORVR system, EPA disregarded its responsibility under the Act.

Moreover, with respect to ORVR canisters, it is not clear that either EPA or NHTSA concluded that these systems are incapable of being made *reasonably* safe.[15] Rather, it appears from the record that both EPA and NHTSA balanced the risks and benefits of ORVR against the risks and benefits of Stage II controls. *See* DOT Assessment at 3 (NHTSA weighed availability of Stage II controls in its ORVR safety assessment); 57 Fed.Reg. at 13,223 (EPA considers the availability of Stage II controls integral to decision); *see also id.* at 13,221 (NHTSA concluded that "some risk" was inherent in ORVR canisters that was not present in Stage II controls); Letter from Jerry Ralph Curry, NHTSA, to William G. Rosenberg, Assistant Administrator for Air and Radiation, EPA (Oct. 31, 1991) ("after weighing the alternatives," NHTSA would find ORVR an unreasonable safety risk), *reprinted in* J.A. at 464; EPA Briefing at 9a (relative effectiveness of

---

**13.** One company's tests indicated that it is possible to design a containment bladder that would significantly reduce free space into which vapor can form and thus reduce the need for carbon canisters to capture the escaping vapor. *See* Letter from Jeff Broadhurst, Design Director, Dowty Woodville Polymer, to EPA (Jan. 8, 1992), *reprinted in* J.A. at 519. That company projected that prototype bladders could be evaluation-ready within one year. *Id.* Indeed, another fuel cell manufacturer claimed to have begun development of a flexible bladder tank, both to resist rupture in collisions and to reduce hydrocarbon emissions. *See* Schwendeman Memo. This manufacturer estimated that it could be set up to manufacture bladders with as little as six months lead time. *Id.*

**14.** Because of higher working capacity, carbon cloth could significantly reduce the size of

ORVR canisters and hence reduce whatever risks are associated with increased canister size (e.g., greater chance of impact in a crash as well as greater likelihood of integrity loss on impact). Note, though, that the positive relationship between canister size and fire risk was an assumption, not a finding, of the NHTSA study.

**15.** Under section 202(a)(4) of the CAA, EPA is charged with the responsibility of seeing that no emission control system is installed in production vehicles that would "cause or contribute to an unreasonable risk to public health, welfare, or safety." 42 U.S.C. § 7521(a)(4)(A) (Supp. 1990). EPA assumed that its discretion under section 202(a)(6) was also measured by this standard. *See* 57 Fed.Reg. at 13,222–23.

ORVR and Stage II controls); *cf.* 57 Fed. Reg. at 13,223 (canister systems *"potentially* subject to additional failure modes") (emphasis added). This reading is borne out by EPA's explanation of its final action that the decision not to promulgate ORVR standards was heavily dependent upon the ready availability of Stage II controls. *See id.* at 13,230.

Although EPA finally concluded that canister based systems present safety problems which are not "entirely capable of resolution," *id.,* much of the data in the record directly contravenes this assertion. For instance, NHTSA assumed that ORVR canisters would add complexity to current fuel systems.[16] Yet, the EPA simple prototype proved that it was at least possible to build a simple ORVR canister system.[17] Moreover, the analytical approach used by NHTSA contains a logical flaw. NHTSA's tests seem to show that ORVR may increase risk under certain conditions. However, NHTSA presented no data on the likelihood of those conditions existing in the real world. Therefore, it is impossible to move directly from NHTSA's data to EPA's conclusion that ORVR canisters pose an *unreasonable* risk.

In addition, many of the benefits of ORVR that were recognized by EPA in its 1988 draft report were largely ignored in its final determination that ORVR is unreasonably unsafe. For instance, the number of service station fires [18] will almost certainly be reduced by ORVR. EPA Draft at 4–1. Second, repeated or prolonged dermal contact with liquid gasoline due to spillage can be reduced by ORVR, thus relieving the resultant skin irritation and dermatitis. *See id.* at 4–12. Perhaps most significantly, ORVR may help lower fuel tank pressures.[19] Greater fuel tank pressure leads to, among other things, fuel dispersion in tank rupture accidents. ORVR canister systems would require an increase in the size of the fuel tank venting orifices and thus decrease fuel tank pressures. *Id.* at 4–14. Finally, under operating conditions, vehicles sometimes create vapors that exceed the capacity of current evaporative canisters leading to so called "breakthrough" and the seepage of vapors into the engine compartment. Larger canisters

---

**16.** It is not clear that complexity is an evil in itself. Most of the automotive innovation in recent years has added substantial complexity to passenger vehicles without a noticeable degradation of safety (e.g., fuel injection, electronic ignition, anti-lock brakes, air bags, and computerized instrumentation). *See* API Comments at 34 (downward trend in number of fires per thousand automobile crashes since 1974 while vehicle complexity increased over the same period) (citing NHTSA, Motor Vehicle Fires in Traffic Crashes and the Effects of the Fuel System Integrity Standard, DOT HS 675 (Nov. 1990)). Indeed, many of the same concerns regarding the risk of more complex fuel systems were voiced fifteen years ago with regard to evaporative control systems. *Cf.* 38 Fed.Reg. 22,417 (1973) (additional safety tests initiated by NHTSA *in response to catalytic converter* requirement). Yet, those fears have proven unfounded. The Center for Auto Safety ("CAS") performed an analysis of NHTSA's data pertaining to the three model years before and after evaporative controls were required which seems to show an average *decrease* of 5.5% in the rate of fires in passenger car crashes after evaporative canisters were required. *See* Statement of Clarence M. Ditlow, Director, CAS, before the EPA at 4 (Sept. 26, 1991) (table) [*hereinafter* "CAS Statement"], *reprinted in* J.A. at 476. Thus, the assumption that added complexity means added risk is itself tenuous.

**17.** Testing suggests that the EPA simple system is not completely impractical. *Cf.* CAS Statement at 6 (vehicle did not exhibit performance problems during 600 mile evaluation).

**18.** The National Fire Incident Reporting System data base reveals that four to six percent of all service station fires are due to refueling emissions or spillage. This amounts to 99 to 148 fires a year. EPA Draft at 4–6. ORVR systems could prevent 62 to 86 service station fires each year, or about 3% of the national total. *Id.* at 4–7. Stage II controls will also decrease the number of service station fires. *See* DOT Review at 20.

**19.** In the past decade, several factors have contributed to an overall increase in fuel tank operating pressures. Among the factors are high volatility fuels, increased fuel system pressures necessary for fuel injection, recirculation of heated fuel to the fuel tank which enhances fuel evaporation and hence tank pressure, and the use of extremely small diameter venting orifices to contain liquid vapor within the tank in order to meet federal emissions standards. EPA Draft at 4–13. This problem has been partially ameliorated by federally mandated reductions in fuel volatility ratings. *See* Volatility Regulations, 55 Fed.Reg. 23,658 (1990).

in ORVR systems would capture and contain these vapors.

■ In short, the record as a whole does not substantiate a finding that ORVR systems present inherent and unreasonable safety risks. What is clear is that EPA has decided that ORVR canister systems are not worth the risk *given that Stage II controls are a viable alternative.* However, even were we to accept that Congress left some small amount of discretion in the statute for EPA to decline to require ORVR if it found such systems unreasonably hazardous, that discretion would be constrained to a measurement of the safety considerations of ORVR alone, weighed against the incremental environmental protection that ORVR systems would provide.[20] Thus, EPA's balancing of ORVR canisters against Stage II controls would still be an inappropriate basis upon which to decline to promulgate ORVR standards.[21]

B. *The Lapse of Stage II Requirements*

■ EPA also argues that section 202(a)(6)'s provision for the lapse of Stage II requirements when EPA promulgates ORVR standards creates an ambiguity that warrants deference to the Agency's interpretation of the statute under the second step of *Chevron.* Specifically, section 202(a)(6) reads in pertinent part:

> The requirements of section 7511a(b)(3) of this title (relating to stage II gasoline vapor recovery) for areas classified under section 7511 of this title as moderate for ozone shall not apply after promulgation of such standards and the administrator may, by rule, revise or waive the application of the requirements of section 7511a(b)(3) of this title for areas classified under section 7511 of this title as Serious, Severe, or Extreme for ozone, as appropriate, after such time as the Ad-

ministrator determines that onboard emissions control systems required under this paragraph are in widespread use throughout the motor vehicle fleet.

42 U.S.C. § 7521(a)(6) (Supp.1990). The effective date of the Stage II requirements under section 182(b)(3) of the Act, 42 U.S.C. § 7511a(b)(3) (Supp.1990), is November 15, 1992, one year after the date by which EPA was obligated to promulgate ORVR standards. EPA concludes from this that Congress provided for an alternative pollution control system in the event that EPA determined that ORVR is unsafe.

However, this reasoning relies on a specious reading of the statutory language. Section 202(a)(6) expressly provides for the termination of Stage II requirements *after* ORVR standards are promulgated, not *if* they are promulgated—the implication clearly being that ORVR standards will, at some future time, be promulgated and that Stage II will become unnecessary in certain nonattainment areas at that time. The Stage II requirements, then, are not so much an alternative to ORVR as they are an interim measure to provide environmental protection in the event that ORVR standards are inexplicably delayed.

This "fall-back" approach does not run afoul of any of our standard canons of interpretation. To begin with, there is no direct conflict between the two related sections of the CAA. If ORVR standards had been promulgated on time, the Stage II requirements in moderate nonattainment areas would merely have been superfluous. On the other hand, if EPA missed the statutory deadline—as it in fact has—some vapor emission control would be provided. Although perhaps not the most elegant framework, it was not unreasonable for Congress to provide for contingent environmental protection in the event that EPA missed the statutory deadline, given EPA's

---

**20.** EPA recognized in its Final Action that this would be the standard against which the "reasonableness" of the risks of ORVR should be measured. *See* 57 Fed.Reg. at 13,230 (safety risks not an absolute bar, but must be weighed against marginal emission control). However, the entire analysis proceeded on the basis of measuring ORVR against Stage II.

**21.** In concluding that EPA's balancing approach was incompatible with the mandatory terms and technology-forcing intent of § 202(a)(6), we express no view on whether, should some ORVR technology reach the § 202(a)(4) production certification stage, EPA might properly consider as part of its "risk reasonableness" assessment the availability of the Stage II alternative.

record with regard to implementing the CAA. *See NRDC v. Thomas,* 805 F.2d at 416 (EPA "behind the statutory timetable" of the CAA); *Sierra Club v. California,* 658 F.Supp. 165, 175 (N.D.Cal.1987) (EPA had "long-standing unwillingness to comply with" the CAA); *see also* 136 CONG.REC. S2,436 (daily ed. Mar. 8, 1990) ("[T]he history of the Clean Air Act demonstrates that we cannot rely on EPA to follow through on even its mandatory obligations.") (statement of Senator Lieberman). Thus, the overlap between sections 182(b)(3) and 202(a)(6) demonstrates not an ambiguity in the statute, but congressional prudence in providing for foreseeable administrative delays.[22]

It was suggested at oral argument that requiring EPA to promulgate ORVR standards at this point in time, now that the deadline has passed and Stage II controls have become mandatory in moderate and worse non-attainment areas, would impose inefficient double-controls in many areas. Yet, this is not precisely correct, since overlapping Stage II and ORVR controls will not result in complete duplication. As EPA explained in its Final Action, the benefits provided by ORVR are small[23] at first and increase as fleet turnover occurs. 57 Fed. Reg. at 13,225. Even by the most optimistic view, it will be well into the twenty-first century before a substantial portion of the automobile fleet will be equipped with ORVR fuel systems. *See id.* (at least ten years until ORVR becomes an effective control). Stage II controls will provide important environmental protection in the areas with the worst ozone accumulation while this turnover takes place. In addition, by the terms of the statute, ORVR standards will only apply to light-duty vehicles. Whatever investment has already been made in Stage II controls for moderate nonattainment areas that would have been unnecessary had EPA promulgated ORVR standards on time will benefit the environment by capturing vapor emissions from heavy trucks, motorcycles, and other vehicles not encompassed within the ORVR standards. Thus, a literal reading of the statute does not lead to patently incoherent results. In any event, to the extent that double-control will occur now that the statutory deadline has passed, that contingency was so obvious that it must have been contemplated and accepted by Congress. It is not within the province of this court to second guess such clear legislative policy choices.

The converse problem was also raised at oral argument by EPA, which noted that a period of *no* control could occur in some moderate nonattainment areas if the requirements for Stage II controls cease to apply after the promulgation of ORVR standards and actual ORVR systems prove to be unreasonably unsafe so that they are denied certification under section 206(a)(3)(A). Although this is a legitimate concern for the Agency, it is not one that we can resolve.[24] The CAA provides that

---

**22.** This is not the only device of its type in the CAA. As Congressman Waxman has explained:

An[ ] important example is the requirement for EPA issuance of maximum achievable control technology (MACT) regulations for major sources of hazardous air pollutants. The regulation of hazardous air pollutants is an area where EPA's track record is exceptionally poor, having regulated only seven pollutants in twenty years, and Congress sought special assurances that regulations would be issued. Such assurances are provided in section 112(j), where states are directed to establish MACT standards of their own in their permits for major sources, if EPA has not issued applicable standards within eighteen months of the rule-making deadline. Hence, technological steps to control air toxics will be required by the state if EPA fails to issue regulations.

Henry Waxman, *An Overview of the Clean Air Act Amendments of 1990,* 21 Envtl.L. 1721, 1746 (1991) (citations omitted).

**23.** Indeed, the actual benefits are nonexistent "at first," since no new vehicles need be equipped with ORVR systems until the fourth model year after the year in which EPA promulgates ORVR standards. 42 U.S.C. § 7521(a)(6) (Supp.1990).

**24.** Note, however, that States may require various emission controls regardless of federal standards. *See, e.g.,* CAL. HEALTH AND SAFETY CODE § 41954 (West 1992) (state certification process for gasoline vapor control). In any case, moderate nonattainment areas that fail to come into attainment by 1996 will be redesignated "serious" and will therefore be subject to Stage II controls. *See* 42 U.S.C. §§ 7511(a)(1), (b)(2)

the requirements for Stage II controls shall not apply in moderate nonattainment areas once ORVR standards are promulgated. The possibility that ORVR systems will not reach the production fleet because of a failure to satisfy certification requirements must have been known to Congress when it passed the 1990 amendments. Thus, the scheme reflects an implicit policy decision by Congress. Whatever the wisdom of that decision, it is committed to Congress alone to make.

### III. CONCLUSION

The text of section 202(a)(6) clearly manifests a congressional intent that EPA promulgate ORVR standards. The requirement that EPA consult with DOT prior to promulgating the standards does not derogate from that mandatory duty. In addition, the provisions in the CAA for Stage II controls provide for an interim solution to the problem of ozone accumulation until ORVR systems become commonplace. ORVR and Stage II controls are not two alternative approaches between which EPA has discretion to choose. Moreover, even if we were to allow that Congress did not intend for EPA to require ORVR systems if EPA found that ORVR presented inherent and unreasonable safety risks, the record would not support such a finding. At most, it appears that EPA performed a net weighing of the risks and benefits of ORVR *canisters* relative to Stage II controls. In the end, EPA concluded that it preferred Stage II controls. However, that is not the equivalent of a finding that all ORVR systems present inherent and unreasonable safety risks. Thus, EPA's final decision must be set aside and ORVR standards promulgated in compliance with the CAA.

*So Ordered.*

STEPHEN F. WILLIAMS, Circuit Judge, concurring:

I reluctantly agree with the court that the "shall" of § 202(a)(6) is mandatory, as most "shalls" are, subject only to a very

narrow escape hatch—one that would open only if EPA's consultation with the Department of Transportation yielded a finding that all plausible "onboard" (ORVR) systems "present inherent and unreasonable safety risks". Maj. Op. at 273. The EPA finding does not rise to that extreme level. Maj. Op. 268–71. I write separately for two reasons. First, I wish to identify yet another snag that this congressional choice may lead to—a snag that is, however, inherent in the sort of command-and-control, technology-forcing solution that Congress adopted. Second, I wish to emphasize that the exact character of the EPA's decision under § 202(a)(4) is not before this court, so that our judgment necessarily leaves that issue open.

### I

The majority opinion addresses two risks that the statute runs under our interpretation. First, it may leave these ozone-generating vapors substantially uncontrolled either by "onboard" systems installed by motor vehicle manufacturers or by "Stage II" controls installed by gas station operators. Maj. Op. at 273. Second, it may lead to overlapping controls by both. Maj. Op. at 272–73. There is yet a third risk—that auto and gasoline buyers will bear the expense of *both* systems (or much of that expense) yet secure the benefits of neither. Auto makers will incur at least the R & D costs of onboard controls (and auto buyers will bear them) because of the regulation required by our decision, yet, if none ever passes the ultimate safety test of § 202(a)(4), they will not be installed. Gasoline station operators may incur many of the costs of Stage II controls because they will apply in "moderate" (and worse) areas until such time as the EPA actually issues the required onboard regulation, but they will cease to apply in moderate areas once the onboard regulation issues, because thereafter (*regardless* of whether the onboard system ever can be installed), the last sentence of § 202(a)(6) specifies that the Stage II controls "shall not apply" in

---

(Supp.1990). Likewise, marginal nonattainment areas that fail to reach attainment by 1993

will be redesignated "moderate" then and "serious" in 1996. *See id.*

moderate areas after promulgation of the onboard standards. See Maj. Op. 264–65 n. 8.

As the majority observes of the no-control and the overlapping control scenarios, however, all this is implicit in the scheme. See Maj. Op. 272, 273. Congress evidently believed that a reasonably safe system of onboard controls was likely enough, and the value of securing them great enough, to justify running the various risks outlined in these opinions. The risks are, as the majority observes, perfectly obvious. Ours not to count the cost.

Is all this an inevitable cost in the quest for a clean environment? Under a system of either emissions fees or marketable permits, firms whose production or products pollute can be induced to invest in R & D for pollution-reducing devices under conditions substantially similar to those under which they invest in R & D for products whose demand is generated by consumers—investing up to the point where the marginal cost equals the marginal expected[1] revenues. The difference is simply that the marginal expected revenues take the form of emissions taxes averted, emission permit expenses averted, or revenues from the sale of emissions permits. Such systems offer comparatively efficient methods for addressing pollution, similar to the ways a market economy produces other goods. With rare exceptions, however, Congress has declined to use such methods. Accordingly, consumers must bear the burdens implicit in the statute that we interpret today.

## II

The majority opinion suggests at 269–70 and 271 that the safety determination made by the EPA, prefiguring the one ultimately to be made before installment under § 202(a)(4), may not take into account the comparative effectiveness of Stage II controls. Perhaps so, but I should be most reluctant to reach any such conclusion. If system A posed a safety risk of 100 lives a year, one might conclude that that was an acceptable price for a 50% reduction in ozone if it were the *only* way of achieving the reduction. But if the same reduction could be achieved by system B, at a safety risk of only 10 lives a year and no material alternative drawbacks, it would be odd to find system A reasonable. The interaction that Congress specified between onboard and Stage II controls (in the last sentence of § 202(a)(6)) makes clear that Congress saw them as at least partial substitutes, as they plainly are as a matter of physics and technology. Under these circumstances, a court should not leap to the view that the "reasonableness" balancing called for by § 202(a)(4), see Maj. Op. 269 n. 15, precludes any consideration of the effect of the Stage II applications that legally depend on the absence of onboard controls.

Indeed, no party here argues that the § 202(a)(4) balancing must be so narrow. EPA, as the majority notes, regarded the two alternative methods as relevant to the § 202(a)(4) assessment on onboard devices. Maj. Op. at 269–70; see also 57 Fed.Reg. 13,220, 13,230/3 (April 15, 1992). Petitioners do *not* object to this element of EPA's reasoning. Rather, they make the much more limited argument that EPA was internally inconsistent in that it considered the safety benefits of Stage II controls at the gas stations where they would be installed without addressing the *absence* of control at the gas stations that would be uncontrolled even if Stage II controls were as broadly applicable as possible under the statute. See Reply Brief at 16–19 & n. 10. As the permissible scope of the § 202(a)(4) balance is not before us, there is no need to take any position on the subject. To the extent that the text, Maj. Op. 269–70, 271 is in tension with *id.* 271 n. 21, plainly the footnote should be deemed controlling.

---

**1.** "Expected" means the average of all anticipated outcomes, each weighted in accordance with its estimated likelihood.