## NATIONAL RIFLE ASSOCIATION OF AMERICA, INC. et al., Appellants,

v.

## Janet RENO, Attorney General of the United States, Appellee.

### No. 99–5270.

United States Court of Appeals,
District of Columbia Circuit.

Argued March 17, 2000.

Decided July 11, 2000.

---

Stephen P. Halbrook argued the cause for appellants. With him on the briefs was Richard E. Gardiner.

Michael S. Raab, Attorney, U.S. Department of Justice, argued the cause for appellee. On the brief were David W. Ogden, Acting Assistant Attorney General, Mark B. Stern, and Susan L. Pacholski, Attorneys, and Wilma A. Lewis, U.S. Attorney.

Before: SENTELLE, TATEL and GARLAND, Circuit Judges.

Opinion for the Court filed by Circuit Judge TATEL.

Dissenting opinion filed by Circuit Judge SENTELLE.

TATEL, Circuit Judge:

The National Rifle Association challenges a Justice Department regulation providing for temporary retention of data generated during background checks of prospective firearms purchasers, as required by the Brady Handgun Violence Prevention Act. According to the NRA, the Brady Act requires immediate destruction of personal information relating to lawful firearm transactions. The Attorney General interprets the statute differently, arguing that temporary retention of data for at most six months is necessary to audit the background check system to ensure both its accuracy and privacy. Finding nothing in the Brady Act that unambiguously prohibits temporary retention of information about lawful transactions, and finding that the Attorney General has reasonably interpreted the Act to permit retention of such infor-

mation for audit purposes, we affirm the district court's dismissal of the complaint.

## I.

The Gun Control Act of 1968 makes it unlawful for certain individuals, including convicted felons, fugitives from justice, and illegal aliens, to possess firearms. *See* 18 U.S.C. §§ 922(g). The Brady Handgun Violence Prevention Act of 1993 required the Attorney General to establish a "national instant criminal background check system," known as the NICS, to search the backgrounds of prospective gun purchasers for criminal or other information that would disqualify them from possessing firearms. *See* § 103(b), Pub.L. No. 103–159, 107 Stat. 1536. A computerized system operated by the FBI, the NICS searches for disqualifying information in three separate databases: (1) the "NICS Index," containing records on persons known to be disqualified from possessing firearms under federal law; (2) the "National Crime Information Center," containing records on protective orders, deported felons, and fugitives from justice; and (3) the "Interstate Identification Index," containing criminal history records. 28 C.F.R. § 25.6(c)(1)(iii).

Before selling a weapon, firearm dealers must submit the prospective purchaser's name, sex, race, date of birth, and state of residence to the NICS operations center at the FBI. *Id.* § 25.7(a). If the firearm dealer is in a state that has elected to serve as a "point of contact" for NICS queries, the dealer must submit the inquiry to the relevant state agency. *Id.* § 25.6(d). Upon receiving such an inquiry, the FBI or state agency must immediately provide the gun dealer with one of three responses: (1) "proceed," if no information in the system indicates that a firearm transfer would be unlawful; (2) "denied," if the prospective purchaser may not legally possess a firearm; or (3) "delayed," if further research is necessary. *Id.* § 25.6(c)(1)(iv); Brady Act § 103(b), 107 Stat. at 1541.

A Justice Department regulation requires the FBI to retain records of all NICS background searches—including names and other identifying information about prospective gun purchasers—in an automated "Audit Log." 28 C.F.R. § 25.9(b). According to the regulation, the Audit Log is "a chronological record of system (computer) activities that enables the reconstruction and examination of the sequence of events and/or changes in an event." *Id.* § 25.2. The regulation's preamble describes the purpose of the Audit Log:

> By auditing the system, the FBI can identify instances in which the NICS is used for unauthorized purposes, such as running checks of people other than actual gun transferees, and protect against the invasions of privacy that would result from such misuse. Audits can also determine whether potential handgun purchasers or [gun dealers] have stolen the identity of innocent and unsuspecting individuals or otherwise submitted false identification information, in order to thwart the name check system. The Audit Log will also allow the FBI to perform quality control checks on the system's operation by reviewing the accuracy of the responses given by the NICS record examiners to gun dealers.

*National Instant Criminal Background Check System Regulation,* 63 Fed.Reg. 58303, 58303–04 (1998) (hereinafter, *NICS Regulation*); *see also* 28 C.F.R. § 25.9(b)(2).

The regulation restricts use of the Audit Log. Information "pertaining to allowed transfers may only be used by the FBI for the purpose of conducting audits of the use and performance of the NICS." 28 C.F.R. § 25.9(b)(2). The Audit Log "may not be used by any department, agency, officer, or employee of the United States to establish any system for the registration of firearms, firearm owners, or firearm transactions or dispositions. The Audit Log will be monitored and reviewed on a regu-

lar basis to detect any possible misuse of the NICS data." *Id.*

The Notice of Proposed Rulemaking had called for retaining information relating to allowed transfers in the Audit Log for eighteen months. *National Instant Criminal Background Check System Regulations,* 63 Fed.Reg. 30430, 30432 (proposed June 4, 1998). Declaring that "the general retention period for records ... in the NICS Audit Log should be the minimum reasonable period for performing audits on the system," the final regulation reduced the retention period to "in no event more than six months." *NICS Regulation,* 63 Fed.Reg. at 58304. The regulation's preamble states that "the FBI shall work toward reducing the retention period to the shortest practicable period of time less than six months that will allow basic security audits of the NICS." *Id.* The Attorney General has since published a proposed rule that would shorten the retention period for records of allowed transfers to ninety days. *National Instant Criminal Background Check System Regulation,* 64 Fed.Reg. 10262, 10264 (proposed March 3, 1999).

When removed from the Audit Log, personal information relating to allowed transfers is destroyed. 28 C.F.R. § 25.9(b)(1). NICS records relating to denied firearm transfers are kept in the Audit Log for ten years, then transferred to a Federal Records Center for storage. *Id.* State agencies performing background checks in lieu of the FBI may retain information on allowed transfers if the records are "part of a record system created and maintained pursuant to independent state law regarding firearms transactions." *Id.* § 25.9(d)(1), (d)(2).

On the day the NICS regulation became effective, the National Rifle Association of America, joined by the Law Enforcement Alliance of America, Inc., and four John and Jane Does, filed suit in the U.S. District Court for the District of Columbia, arguing that temporary retention of NICS records of allowed transfers violates three provisions of the Brady Act: section 922(t)(2)(C), requiring that the system "destroy" records of allowed transactions; section 103(i)(1), prohibiting the government from "requir[ing] that any [NICS] record ... be recorded at or transferred to a [government] facility"; and section 103(i)(2), prohibiting the government from "us[ing] the [NICS] system ... to establish any system for the registration of firearms." 107 Stat. at 1540, 1542. The complaint also alleged that the Attorney General has no authority to exempt NICS information retained by state agencies from the Brady Act's destruction requirement, even if that information is "part of a record system created and maintained pursuant to independent state law."

The Attorney General interpreted the Act differently, arguing that neither section 922(t)(2)(C) nor section 103(i)(1) prohibits temporary retention of NICS records, and that the Audit Log is not a "system for ... registration" within the meaning of section 103(i)(2). For authority to create the Audit Log, the Attorney General relied on her statutory obligations to establish a system capable of providing accurate information on the lawfulness of firearm transactions, *see* Brady Act, § 103(b), 107 Stat. at 1541, and to protect the privacy and security of the NICS. *See* Brady Act, § 103(h), 107 Stat. at 1542.

The district court, finding nothing in the Brady Act to require immediate destruction and the Attorney General's construction of the statute reasonable, dismissed the complaint pursuant to Federal Rule of Civil Procedure 12(b)(6). Renewing the arguments it made in the district court, the NRA appeals. Our review is *de novo.* *See, e.g., Brown v. Plaut,* 131 F.3d 163, 167 (D.C.Cir.1997).

## II.

Because the NRA challenges a statute administered by a government agency, we proceed in accordance with the familiar two-part test of *Chevron U.S.A. Inc. v.*

*Natural Resources Defense Council, Inc.,* 467 U.S. 837, 104 S.Ct. 2778, 81 L.Ed.2d 694 (1984). We ask first "whether Congress has directly spoken to the precise question at issue," for if it has, "that is the end of the matter; for the court, as well as the agency, must give effect to the unambiguously expressed intent of Congress." *Id.* at 842–43, 104 S.Ct. 2778. If we find the statute silent or ambiguous with respect to the precise question at issue, we proceed to the second step of *Chevron* analysis, asking "whether the agency's answer is based on a permissible construction of the statute." *Id.* at 843, 104 S.Ct. 2778. At this point in our review, we afford substantial deference to the agency's interpretation of statutory language. *See id.* at 844, 104 S.Ct. 2778.

■ We begin with the NRA's *Chevron* one argument that three provisions of the Brady Act unambiguously prohibit the Attorney General from retaining information about allowed transactions for any purpose, including auditing. In evaluating these arguments, we must not "confine [ourselves] to examining a particular statutory provision in isolation. The meaning—or ambiguity—of certain words or phrases may only become evident when placed in context." *FDA v. Brown & Williamson Tobacco Corp.,* —— U.S. ——, 120 S.Ct. 1291, 1300, 146 L.Ed.2d 121 (2000). We must also "exhaust the traditional tools of statutory construction," *Natural Resources Defense Council, Inc. v. Browner,* 57 F.3d 1122, 1125 (D.C.Cir.1995) (internal quotation marks omitted), and may examine the statute's legislative history in order to "shed new light on congressional intent, notwithstanding statutory language that appears superficially clear." *Id.* at 1127 (internal quotation marks omitted). Finally, "we must be guided to a degree by common sense as to the manner in which Congress is likely to delegate a policy decision ... to an administrative agency." *Brown & Williamson,* 120 S.Ct. at 1301.

■ The first Brady Act provision the NRA relies on is section 922(t)(2):

If receipt of a firearm would not [be unlawful], the system shall—

(A) assign a unique identification number to the transfer;
(B) provide the [firearms dealer] with the number; and
(C) destroy all records of the system with respect to the call (other than the identifying number and the date the number was assigned) and all records of the system relating to the person or the transfer.

18. U.S.C. § 922(t)(2). According to the NRA, when the statute says "destroy all records" it means "destroy all records immediately," not within six months. That is certainly one possible interpretation of section 922(t)(2)(C). At *Chevron* step one, however, the question is whether the statute *unambiguously* requires immediate destruction. We think the answer is no.

To begin with, section 922(t)(2)(C) does not say "destroy immediately"; it says only "destroy." When Congress wants to instruct an agency not only to take certain action, but to take it immediately, it knows how to do so. For example, once an administrative agency determines whether a person requesting administrative records is entitled to receive them, Congress requires the agency to "immediately notify the person making such request of such determination." 5 U.S.C. § 552(a)(6)(A)(i). Similarly, the Equal Employment Opportunity Commission must "immediately refer" to the Merits System Protection Board any decision finding that the Board incorrectly interpreted governing law or issued a decision unsupported by record evidence. *Id.* § 7702(b)(5)(B). Congress even used the word "immediately" elsewhere in the Brady Act. Describing the NICS and the Attorney General's obligation to make information available to firearms dealers, Congress referred to a system of information "to be supplied immediately." Brady Act § 103(b), 107 Stat. at 1541. Yet when in section 922(t)(2)(C) Congress directed the Attorney General to

"destroy" the information, it did not specify "immediately." The word's absence indicates to us that Congress has not unambiguously required immediate destruction of NICS records.

The NRA argues that, read in context, section 922(t)(2)(C) does in fact require immediate destruction of NICS records relating to allowed transfers. Its argument goes like this: (1) Congress intended the NICS to function as a database of "information, *to be supplied immediately*, on whether receipt of a firearm" would be prohibited by law. Brady Act § 103(b), 107 Stat. at 1541 (emphasis added). (2) Because under the statute providing a NICS identification number signals a gun dealer that a transfer may proceed, *see* 18 U.S.C. § 922(t)(1)(B)(i), the "assign" and "provide" mandates of sections 922(t)(2)(A) and (B) must be executed immediately. (3) "The 'destroy' mandate [of section 922(t)(2)(C) ] is part and parcel of this system, and compliance with that mandate must also be immediate." Appellants' Br. at 21.

We agree with the first two steps of the NRA's reasoning. The statute clearly requires NICS identification numbers to be both assigned and provided immediately. *See* Brady Act § 103(b), 107 Stat. at 1541; 18 U.S.C. § .922(t)(1)(B)(i); *but cf.* 28 C.F.R. § 25.6(c)(1)(ii) (providing identification numbers prior to conducting background searches). Destruction of NICS records, however, plays no role in either authorizing . or rejecting firearm transfers—the action that section 103(b) requires to be taken immediately. NICS record examiners, can complete the "assign" and "provide" tasks and respond immediately. to gun dealers without immediately . destroying the information. The "destroy" mandate is thus not .·"part and parcel" of "assign" and "provide."

Our conclusion that section 922(t)(2)(C) does not unambiguously require immediate destruction of NICS records finds support in the Act's legislative history. As reported to the House by the Judiciary Commit-

tee, the Brady bill contained no destruction requirement at all. *See* H.R.Rep. No. 103–344 (1993), *reprinted in* 1993 U.S.C.C.A.N. 1984. The obligation to destroy NICS records was added during floor debate. As passed by the House, the bill stated that the system shall "immediately destroy all records" of allowed transactions. *See* 139 Cong. Rec. H9098, 9123, 9144 (daily ed. Nov. 10, 1993). The Conference Committee, however, adopted the Senate's version of the destruction requirement, which did not contain "immediately." *Compare* 139 Cong. Rec. H9123 (daily ed. Nov. 10, 1993) (House version), *with* 139 Cong. Rec. S16506 (daily ed. Nov. 19, 1993) (Senate version). It was this version that both houses approved and the President signed.

To be sure, as the NRA points out, the · Conference Report did not list the absence of "immediately" among the substantive differences between the House and Senate bills. *See* H.R. Conf. Rep. No. 103–412 (1993), *reprinted in* 1993 U.S.C.C.A.N. 2011. But this does not change the critical fact: The word "immediately," which had appeared in the House bill, is missing from the final Act. Although not necessarily reflecting congressional intent not to require immediate destruction, *see Hammontree v. NLRB*, 925 F.2d 1486, 1492 (D.C.Cir.1991) (en banc), this omission supports our conclusion that congressional intent on the precise question before us—the sole focus of *Chevron* one inquiry—is at least ambiguous.

■ The parties debate the significance of subsequent legislative developments. An appropriations rider, expressly responding to the proposed Audit Log, would have conditioned NICS funding on the "immediate destruction of all information" relating to persons eligible to possess firearms. *See* 144 Cong. Rec. S8680 (daily ed. July 21, 1998) (proposed amendment no. 3233). As in the case of the Brady Act itself, the word "immediately" was deleted from the final act. *See* Omnibus Consolidated and Emergency Supplemental Ap-

propriations Act of 1999 § 621(2), Pub.L. No. 105–277; *see also* An Act Making Consolidated Appropriations For the Fiscal Year Ending September 30, 2000, and For Other Purposes § 619(2), Pub.L. No. 106–113 (using the same language). Also, two bills that would have imposed criminal penalties on government employees who retain NICS records for more than twenty-four hours were introduced but never passed. *See* No Gun Tax Act of 1998, H.R. 3949, 105th Cong.; Firearms Owner Privacy Act of 1998, S. 2175, 105th Cong. § 2. Heeding the Supreme Court's recent warning, "[w]e do not rely on Congress' failure to act" as dispositive evidence of congressional intent. *Brown & Williamson,* 120 S.Ct. at 1312. At the same time, this post-Brady Act legislative activity reflects no unambiguous congressional intent to require immediate destruction of NICS records. Indeed, the effort to require immediate destruction goes on: A bill now pending in the Senate once again calls for records of allowed transfers to be destroyed immediately. *See* Right to Bear Arms Privacy and Protection Act of 2000, S. 2270, 106th Cong. § 5(b).

▮ Our dissenting colleague finds the absence of "immediately" in section 922(t)(2)(C) of no consequence because "[i]n no case has a court held that power has been granted to a federal agency by Congress's failure to enact a limitation to a directly contradictory statutory command." Op. at 141 (Sentelle, J., dissenting). But the Attorney General does not claim authority for the Audit Log regulation from the absence of "immediately," nor from any other congressional failure to prohibit temporary retention of NICS records. Instead, the Attorney General relies on two separate grants of affirmative authority, *i.e.,* sections 103(b) and 103(h) of the Brady Act. Before we can evaluate the reasonableness of the Attorney General's interpretation of those two sections, however, we must consider the NRA's remaining *Chevron* one arguments, *i.e.,* that two other provisions of the Brady Act un-

ambiguously prevent temporary retention of NICS information, for if the NRA is correct, "that is the end of the matter." *Chevron,* 467 U.S. at 842, 104 S.Ct. 2778. The two provisions appear in section 103(i):

> PROHIBITION RELATING TO ESTABLISHMENT OF REGISTRATION SYSTEMS WITH RESPECT TO FIREARMS.
>
> No department, agency, officer, or employee of the United States may—
>
> (1) require that any record or portion thereof generated by the [NICS] be recorded at or transferred to a facility owned, managed, or controlled by the United States or any State or political subdivision thereof; or
>
> (2) use the [NICS] to establish any system for the registration of firearms, firearm owners, or firearm transactions or dispositions, except with respect to persons, prohibited [by law], from receiving a firearm.

Brady Act § 103(i), 107 Stat. at 1542.

The NRA contends that the Audit Log represents a "clear violation" of subsection (1) because the Log "constitutes '*any* record or portion thereof generated by' NICS, and it is 'recorded at or transferred to' a federal facility." Appellants' Br. at 11–12. Several considerations persuade us that subsection (1) is not so clear. To begin with, the statute's prohibition against "record[ing]" a "record" is inherently ambiguous. What is a "record," when has it been "recorded," and what kind of "record" cannot be "recorded?" When a NICS operator enters the name of a prospective purchaser into the system, is that a "record?" Has it been "recorded?" If not, when does it become a "record" that cannot be "recorded?"

In addition to the inherent ambiguity of these words, section 922(t)(2)(C) speaks of "destroy[ing] all records" relating to allowed transfers, apparently assuming that records may be created. Asked about this at oral argument, NRA counsel conceded that records could lawfully be kept for three business days while research is un-

dertaken following a "delayed" response. *See* 18 U.S.C. § 922(t)(ii); 28 C.F.R. § 25.6(c)(1)(iv)(B). If the NRA's answer is correct—and we think it is—then subsection (1) cannot categorically prohibit the government from making records of NICS information.

Moreover, if subsection (1) forbade the government from recording NICS information, it would directly conflict with other provisions of the Brady Act. Subsection (1) reaches "any [NICS] record or portion thereof," yet the Brady Act expressly authorizes the government to retain certain records of NICS transactions. For example, it permits retention of records relating to denied firearm transfers. *See* Brady Act § 103(i)(2), 107 Stat. at 1542 (forbidding use of the NICS to establish a firearm registry "except with respect to persons prohibited [by law] from receiving a firearm"); 18 U.S.C. § 922(t)(2) (requiring destruction of NICS records only if "receipt of a firearm would not [be unlawful]"). Even with respect to allowed transfers, section 922(t)(2)(C) permits retention of certain portions of NICS records. 18 U.S.C. § 922(t)(2)(C) (allowing permanent retention of NICS identification numbers and the dates those numbers were assigned). These limitations on the obligation to destroy NICS records would have no meaning if subsection (1) barred recording of any information generated by the NICS.

To avoid the first of these inconsistencies, the NRA urges us to read into subsection (1) the clause "except with respect to persons, prohibited [by law], from receiving a firearm," which appears at the end of subsection (2) (the no firearm registry provision). " 'The short answer [to this argument] is that Congress did not write the statute that way.' " *Russello v. United States*, 464 U.S. 16, 23, 104 S.Ct. 296, 78 L.Ed.2d 17 (1983) (quoting *United States v. Naftalin*, 441 U.S. 768, 773, 99 S.Ct. 2077, 60 L.Ed.2d 624 (1979)). The language applicable to both subsections (1) and (2)—"No department, agency, officer, or employee of the United States may"— appears in the introductory text, not in the text of the subsections. Had Congress intended the language excepting denied transfers to apply to both subsections, it would have included that language in the introductory text as well. So written, the statute would have read: "If a firearm transfer would not be unlawful, no department, agency, officer, or employee of the United States may. . . ." Indeed, that is just how Congress wrote section 922(t)(2), in which the phrase, "If receipt of a firearm would not [be unlawful]," precedes the separately enumerated requirements to "assign," "provide," and "destroy." Because similarly qualifying language appears neither in section 103(i)'s introductory text nor in subsection (1), we can only conclude that subsection (1) reaches, as its plain text indicates, "any record . . . generated by the [NICS]."

■ Claiming its interpretation of subsection (1) does not conflict with section 922(t)(2)(C)'s requirement that transaction numbers be retained, the NRA argues that Congress can always "establish a general rule" and then "make exceptions." Appellants' Reply Br. at 9. Of course Congress may carve out particular exceptions to a general mandate. Indeed, section 922(t)(2)(C) does precisely that, requiring destruction of all records of allowed transfers "other than the identifying number and the date the number was assigned." 18 U.S.C. § 922(t)(2)(C). Subsection (1), however, contains no similar qualification. "[W]here Congress includes particular language in one section of a statute but omits it in another section of the same Act, it is generally presumed that Congress acts intentionally and purposely in the disparate inclusion or exclusion." *Russello*, 464 U.S. at 23, 104 S.Ct. 296 (quoting *United States v. Wong Kim Bo*, 472 F.2d 720, 722 (5th Cir.1972) (alteration in original)). Accordingly, we presume that when Congress excluded qualifying language from subsection (1), it did so intentionally.

Our conclusion that subsection (1) does not unambiguously prohibit the government from recording NICS information is reinforced by the fact that the Attorney General has advanced an alternative plausible interpretation. Emphasizing the word "require," she argues that the statute only prohibits the government from requiring *third parties*, such as firearm dealers, from recording information at a government facility. Had Congress intended subsection (1) to have the meaning the NRA gives it, the Attorney General argues, the statute presumably would have read: "No department, agency, officer, or employee of the United States may—(1) record any record or portion thereof generated by the [NICS] ... at a [government] facility . ..." That is precisely how Congress wrote subsection (2), which, unlike subsection (1), directly prohibits the government from *using* the system as a firearm registry; it does not prohibit the government from *requiring* that it be used as such. Though we owe no deference to the Attorney General's interpretation of statutory language at this stage of *Chevron* analysis, the plausibility of her view highlights the statute's ambiguity. *See United States v. Nofziger*, 878 F.2d 442, 446–47 (D.C.Cir.1989) (a statute is ambiguous if it can be read in more than one way).

■ This brings us to subsection (2), which forbids the government from "us[ing] the [NICS] system ... to establish any system for the registration of firearms, firearm owners, or firearm transactions or dispositions." According to the NRA, the Audit Log regulation violates this subsection because the Audit Log is itself a "form of registration." Appellants' Br. at 15. But subsection (2) does not prohibit all forms of registration. It prohibits only "*system[s] for the registration* of firearms, firearm owners, or firearm transactions or dispositions." The Audit Log is not such a system. As designed by the Attorney General, it functions as a system for protecting the privacy of the NICS and for quality control. The Audit Log regulation expressly provides that "[i]nformation in the Audit Log pertaining to allowed transfers may only be used by the FBI for the purpose of conducting audits of the use and performance of the NICS." 28 C.F.R. § 25.9(b)(2). To enforce this restriction, "[t]he Audit Log will be monitored and reviewed on a regular basis to detect any possible misuse of the NICS data." *Id.*

The Audit Log, moreover, contains no information about "firearms" or "firearm transactions or dispositions." Nor does it contain a comprehensive list of "firearm owners." To be sure, the Log includes names of persons approved to buy firearms in the past six months, but as the Attorney General observes, "[t]he six-month snapshot of potential firearms transferees in the audit log reveals virtually nothing about the universe of firearms owners in the United States." Appellee's Br. at 26.

To illustrate the difference between the Audit Log and a firearms registry, the Attorney General calls our attention to the central registry of machine guns established by the National Firearms Act. *See* 26 U.S.C. § 5841. The machine gun registry contains information on all machine guns not possessed by the United States, including data on the weapons themselves, dates of registration, and the names and addresses of persons entitled to possess them. *Id.* § 5841(a)(1)-(3). Far less comprehensive, the Audit Log includes no addresses of persons approved to buy firearms, nor any information on specific weapons, nor even whether approved gun purchasers actually completed a transaction. And unlike the machine gun registry, information in the Audit Log is routinely purged after six months. The Audit Log therefore represents only a tiny fraction of the universe of firearm owners.

It does not follow, of course, that the Audit Log could never function as a firearm registry. But the Log's deficiencies as a system for registering firearms make

it unlikely that it would be used for that purpose. Indeed, the NRA does not allege that the FBI has used the Audit Log for purposes other than "conducting audits of the use and performance of the NICS." 28 C.F.R. § 25.9(b)(2). The NRA's argument rests entirely on the fact that the Audit Log contains the names of persons approved to buy firearms in the past six months. This is not enough to convert the Log into a "system for the registration" of firearm owners. The Audit Log regulation is therefore not prohibited by section 103(i)(2).

### III.

Having found nothing in either section 922(t)(2)(C) or section 103(i) that unambiguously prohibits temporary retention of NICS records of allowed transactions for audit purposes, we turn to an examination of the affirmative grants of authority on which the Attorney General relies. She finds authority for the Audit Log regulation in two provisions of the Brady Act: section 103(b), which requires the Attorney General to establish a system capable of immediately providing information on whether a firearm transfer would be unlawful, and section 103(h), which requires the Attorney General to prescribe regulations to protect the system's security and privacy. Because neither provision speaks directly to the creation of an Audit Log, we evaluate the Attorney General's arguments pursuant to the second step of *Chevron* analysis, asking whether the Audit Log regulation reflects "a permissible construction of the statute." *Chevron,* 467 U.S. at 843, 104 S.Ct. 2778. "Such deference," the Supreme Court recently explained, "is justified because 'the responsibilities for assessing the wisdom of ... policy choices and resolving the struggle between competing views of the public interest are not judicial ones,' ... and because of the agency's greater familiarity with the ever-changing facts and circumstances surrounding the subjects regulated." *Brown & Williamson,* 120 S.Ct. at

1300 (quoting *Chevron,* 467 U.S. at 866, 104 S.Ct. 2778). And, as we have said, "[a]s long as the agency stays within [Congress'] delegation, it is free to make policy choices in interpreting the statute, and such interpretations are entitled to deference." *Arizona Public Service Co. v. EPA,* 211 F.3d 1280, 1286–87 (D.C.Cir. 2000) (internal quotation marks omitted) (second alteration in original). So long as the agency's interpretation is reasonable, we uphold it "regardless whether there may be other reasonable, or even more reasonable, views." *Allied Local and Regional Manufacturers Caucus v. EPA,* 215 F.3d 61, 71 (D.C.Cir.2000) (internal quotation marks omitted).

Before considering the Attorney General's interpretation of the Act, however, we must address the NRA's contention that "[n]o deference is due to the Attorney General in interpretation of statutory provisions intended to protect the privacy rights of private citizens from the Attorney General." Appellants' Br. at 30. In support of this fox-guarding-the-henhouse argument, the NRA cites *Independent Insurance Agents of America, Inc. v. Board of Governors of the Federal Reserve System,* 838 F.2d 627, 632 (2d Cir.1988), in which the Second Circuit admonished: "Courts construing statutes enacted specifically to prohibit agency action ought to be especially careful not to allow dubious arguments advanced by the agency ... to thwart congressional intent expressed with reasonable clarity, under the guise of deferring to agency expertise...." We do not read *Independent Insurance Agents* to have added anything new to *Chevron* analysis, much less to have abandoned customary *Chevron* two deference. Courts always try not to defer to "dubious" agency arguments, or to "thwart" congressional intent. Mindful that Congress has acted to curtail the Attorney General's authority, we proceed with ordinary *Chevron* two analysis.

The first Brady Act provision on which the Attorney General relies is section

103(b): "[T]he Attorney General shall establish a national instant criminal background check system that any [gun dealer] may contact ... for information, to be supplied immediately, on whether receipt of a firearm by a prospective transferee would [be unlawful]." Brady Act § 103(b), 107 Stat. at 1541. According to the Attorney General, "Congress would not have ordered her to establish the NICS without being able to ensure that the system [is] working," *i.e.*, performing as Congress intended. Appellee's Br. at 18. As explained in the preamble to the NICS regulation:

> In order to meet her responsibility to maintain the integrity of Department systems, ... the Attorney General must establish an adequate system of oversight and review. Consequently, the FBI has proposed to retain records of approved transactions in an audit log for a limited period of time solely for the purpose of satisfying the statutory requirement of ensuring the privacy and security of the NICS and the proper operation of the system.

*NICS Regulation*, 63 Fed.Reg. at 58303. More specifically, "[a]udits can ... determine whether potential handgun purchasers or [gun dealers] have stolen the identity of innocent and unsuspecting individuals or otherwise submitted false identification information, in order to thwart the name check system. The Audit Log will also allow the FBI to perform quality control checks on the system's operation by reviewing the accuracy of the responses given by the NICS record examiners to gun dealers." *Id.* at 58303–04. Reiterating this point, the March 1999 notice of proposed rulemaking states that "[a]udits of the use of the NICS are considered essential ... to ensure that the system is operating in the manner required by the Brady Act." *National Instant Criminal Background Check System Regulation*, 64 Fed. Reg. at 10263. The Attorney General's brief describes the function of the Audit Log in more detail:

> The audit log enables the FBI to monitor the use of the NICS by firearms dealers, states serving as points of contact, and FBI personnel. The FBI also examines whether the FBI employees and contractors are making correct determinations as to whether potential transferees are disqualified, to ensure that "proceed" responses are not being supplied with regard to persons who are disqualified. Decisions to allow a firearm purchase are not fully automated, and thus officials must review and evaluate records before making a decision. Review of decisions made by NICS examiners is necessary to ensure that responsible individuals make correct decisions on whether a transfer is permissible, and to enable supervisors to provide additional training where necessary.

Appellee's Br. at 16 (internal citations omitted). In addition, the Audit Log is "vital to ensuring that the system (including its software) is working properly from a technical standpoint." Appellee's Br. at 17.

We think the Attorney General's position represents a reasonable interpretation of section 103(b)'s requirement that the NICS provide "information" on whether firearm transfers would be unlawful. The Audit Log, according to the Attorney General, is essential to ensuring the accuracy of that "information." Auditing enables the Attorney General to learn whether NICS operators and state points of contact are making accurate determinations. In short, the Attorney General uses the Audit Log to accomplish the very purpose of the Gun Control and Brady Acts, *i.e.*, to ensure that individuals not authorized to possess firearms are unable to purchase them.

■ Disputing the need for an Audit Log, the NRA contends that quality control measures can be undertaken contemporaneously with background checks. This may be true, but we have no way of knowing whether contemporaneous quality control would ensure that the NICS oper-

ates as Congress required. Nor is it our function to make that judgment. "[I]t is the agencies, not the courts, that have the technical expertise and political authority to carry out statutory mandates." *General Elec. Co. v. EPA,* 53 F.3d 1324, 1327 (D.C.Cir.1995).

Our conclusion that the Audit Log regulation represents a reasonable interpretation of section 103(b) finds support from the fact that auditing is not unusual for computerized systems like the NICS. For example, Justice Department regulations require audits of another computerized database, the Criminal History Record Information System, in order to "verify adherence" to applicable law. 28 C.F.R. § 20.21(e); *see also id.* § 20.1 (stating the purpose of the CHRI system). The regulations further require that "appropriate records ... be retained to facilitate such audits." *Id.* § 20.21(e). We thus have no reason to believe that the Attorney General maintains the Audit Log for some sinister purpose.

The Attorney General also relies on section 103(h): "[T]he Attorney General shall prescribe regulations to ensure the privacy and security of the information of the system...." Brady Act § 103(h), 107 Stat. at 1542. The regulation's preamble explains how the Audit Log performs this function: "By auditing the system, the FBI can identify instances in which the NICS is used for unauthorized purposes, such as running checks of people other than actual gun transferees, and protect against the invasions of privacy that would result from such misuse." *NICS Regulation,* 63 Fed.Reg. at 58303. During the debates on the Brady bill, Senator Leahy put the concern this way:

I am concerned about giving every gun dealer in the country access to people's private lives.... My concerns are that access to the background check system may be abused.... [S]omebody is a neighbor and says, "I really don't care too much for those people who moved

down the street. Check them out for me." I find that a little bit unsettling. 139 Cong. Rec. S16326, S16327 (daily ed. Nov. 19, 1993) (statement of Sen. Leahy).

The NRA offers a different interpretation of the statute's references to privacy and security. As the NRA sees it, the statute is concerned about the privacy of only lawful firearm purchasers. Appellants' Br. at 24. This certainly represents one possible—indeed, quite reasonable—interpretation of section 103(h). But because the statute nowhere identifies precisely whose privacy interests are protected, we defer to the Attorney General's interpretation so long as it is reasonable. *See Chevron,* 467 U.S. at 843 & n. 11, 104 S.Ct. 2778. Here, the Attorney General, the official responsible for establishing and managing a nationwide database of personal information, has determined that auditing is necessary to ensure that the system is not used for unauthorized purposes. Absent evidence that this concern is misplaced, we have no basis for second-guessing the Attorney General's judgment.

The NRA argues that the Attorney General lacks authority to investigate abuses involving gun dealers, pointing out that enforcement of the Gun Control Act (which the Brady Act amended) is vested in the Secretary of the Treasury. *See* Gun Control Act of 1968 § 103, Pub.L. No. 90–618, 82 Stat. 1213, 1226. The Brady Act, however, requires the Attorney General, not the Treasury Secretary, to prescribe regulations to protect the system's privacy.

The NRA next contends that use of the Audit Log to uncover system abuses would "necessarily require warrantless inspection of [gun dealers' records] not based on clear statutory grounds, and thus violate the Fourth Amendment." Appellants' Br. at 36. Urging us not to entertain this claim, the Attorney General argues that the NRA lacks standing to assert the Fourth Amendment rights of gun dealers, that the NRA's argument is unripe, and that the

NRA failed to plead a Fourth Amendment claim in its complaint.

We think the Attorney General misconstrues the NRA's argument. As we understand it, the NRA asserts no current Fourth Amendment violation, but urges us to adopt an interpretation of the Brady Act that, according to the NRA, is necessary to avoid constitutional doubt. Although courts certainly must construe statutes to avoid " 'grave and doubtful constitutional questions,' " *Jones v. United States*, 526 U.S. 227, 239, 119 S.Ct. 1215, 143 L.Ed.2d 311 (1999) (quoting *United States ex rel. Attorney General v. Delaware & Hudson Co.*, 213 U.S. 366, 408, 29 S.Ct. 527, 53 L.Ed. 836 (1909)), we have no basis for crediting the NRA's assertion that the Attorney General's interpretation of the Brady Act raises such questions. To begin with, the March 1999 proposed rulemaking explains that audits of firearm dealers will be performed in conjunction with the Bureau of Alcohol, Tobacco and Firearms' existing system of inspection. *National Instant Criminal Background Check System Regulation*, 64 Fed.Reg. at 10263. Unless that system already violates the Fourth Amendment—the NRA never alleges that it does—we see no basis for concluding that auditing the NICS would suddenly produce constitutional violations. Nor does the NRA identify any specific features of the auditing process that implicate constitutionally protected rights. In short, the NRA only speculates that the government could not uncover abuses of privacy involving the NICS without violating the Fourth Amendment.

Our conclusion that the Audit Log regulation reasonably implements sections 103(b) and 103(h) disposes of the NRA's argument that retention of NICS records for six months is unreasonable when compared with another section of the Brady Act providing for interim background checks during the five-year period the NICS was under development. Performed by state or local chief law enforcement officers, known as "CLEOs," these interim checks were to be completed within five business days if possible, 18 U.S.C. § 922(s)(2) (held unconstitutional in *Printz v. United States*, 521 U.S. 898, 117 S.Ct. 2365, 138 L.Ed.2d 914 (1997)), and records of allowed transfers destroyed within twenty business days. 18 U.S.C. § 922(s)(6)(B)(i). Observing that "[t]he records generated under these [interim] provisions were paper, not computer records [like the NICS] capable of instant destruction," the NRA asserts that "[i]t is impossible to comprehend Congress intending to allow ... federal employees who could destroy computerized records with the push of a button to keep them for six months." Appellants' Br. at 22.

The answer to the NRA's argument is that Congress has given the Attorney General far more responsibility for oversight and implementation of the background check system than it had given CLEOs who performed interim checks. CLEOs were required to search "whatever State and local recordkeeping systems [were already] available and ... a national system designated by the Attorney General." 18 U.S.C. § 922(s)(2). By comparison, section 103(b) required the Attorney General to establish a background check system capable of supplying information immediately. Brady Act § 103(b), 107 Stat. at 1541. The Brady Act gave CLEOs no affirmative oversight responsibilities. By comparison, section 103(h) required the Attorney General to "prescribe regulations to ensure the privacy and security of the information of the system." Brady Act § 103(h), 107 Stat. at 1542. Performing these additional section 103(b) and 103(h) duties is precisely why the Attorney General claims a need temporarily to retain NICS records. Having found the Attorney General's interpretation of these two provisions reasonable, we think it not at all "impossible to comprehend" that she would have authority to retain information longer than CLEOs.

The cases relied on by our dissenting colleague do not require a different result.

In *American Petroleum Institute v. EPA,* 52 F.3d 1113 (D.C.Cir.1995), we invalidated a regulation that implemented a statutory directive to reduce air pollution caused by reformulated gasoline. The regulation re-- quired use of "renewable oxygenates," which, though conserving fossil energy resources and perhaps providing global warming benefits, "might possibly make air quality worse." *Id.* at 1119. For authority to require use of renewable oxygenates, the agency relied only on the reformulated gasoline statute and a general provision permitting it to "prescribe such regulations as are necessary to carry out [its] functions." 42 U.S.C. § 7601(a)(1).

Finding that the agency's fossil fuel and global warming objectives exceeded its authority, we observed that "[t]he sole purpose of the [reformulated gasoline] program is to reduce air pollution." *API,* 52 F.3d at 1119. Although, as EPA argued, the reformulated gasoline provision nowhere expressly prohibited the renewable oxygenate requirement, the dispositive fact was that nothing in the statute authorized it:

> In effect, EPA argues that because Congress has not explicitly limited its authority to promulgate a renewable oxygenate requirement, its interpretation of section 7545(k)(1) thus passes *Chevron*'s first step, and this court must then defer to its ·expansive interpretation of the section under *Chevron*'s second step. To suggest, however, "that *Chevron* step two is implicated any time a statute does not expressly *negate* the existence· of a claimed administrative power (*i.e.* when the statute is not written in 'thou shalt not' terms), is both flatly unfaithful to the principles of administrative law . . . , and refuted by precedent." Thus, we · will not presume a delegation of power based solely on the fact that there is not an express withholding of such power.

*Id.* at 1120 (quoting *Railway Labor Executives' Ass'n v. National Mediation. Bd.,* 29

F.3d 655, 671 (D.C.Cir.1994) (en banc) (first alteration in original)).

This case differs from *API* in two critical respects. First, the Attorney General claims no authority for the Audit Log regulation from the absence of an explicit limitation, such as the fact that the word "immediately" does not appear in section 922(t)(2)(C). Instead, she relies on sections 103(b) and 103(h), and it is her interpretation of those affirmative grants of authority—not the statute's failure to "expressly negate the existence of a claimed administrative power"—that implicates *Chevron* two. Thus, we do not "presume a delegation of power based solely on the fact that there is not an express withholding of such power." *API,* 52 F.3d at 1120. Instead, we conclude that the Attorney General has reasonably interpreted sections 103(b) and 103(h) to authorize NICS auditing—a question we could not even have reached without first determining whether section 922(t)(2)(C) expressly prohibits auditing.

Second, the Attorney General does not rely on a general provision empowering her to prescribe regulations necessary to carry out her statutory functions. She issued the Audit Log regulation to perform functions expressly authorized by sections 103(b) and 103(h). Far from "tak[ing] on additional powers," Op. at 140 (Sentelle, J., dissenting), the Attorney General has merely carried out the tasks that Congress expressly delegated to her.

Equally distinguishable, *Halverson v. Slater,* 129 F.3d 180 (D.C.Cir.1997), involved a challenge to a Department of Transportation regulation delegating certain responsibilities under the Great Lakes Pilotage Act to the Saint Lawrence Seaway Development Corporation. For authority to issue the regulation, the Secretary had relied on general statutory authority to delegate secretarial responsibilities. The Secretary argued that a different statute, one that expressly authorized delegation of Pilotage Act responsibilities to Coast Guard officials, did

not prohibit the delegation to the Corporation because nothing in that statute "*expressly* prohibit[ed] delegation of [these] powers and duties to a non-Coast Guard official." *Id.* at 186. Invalidating the delegation, we concluded that "the absence of an express proscription ... provides no green light to ignore the proscription necessarily implied by the limiting language of [the Coast Guard statute]." *Id.* at 187.

Our dissenting colleague, arguing that this case also involves "a statute conferring specific powers upon a cabinet officer"—*i.e.*, "assign," "provide," and "destroy"—concludes that the Audit Log regulation exceeds Congress' grant of authority. Op. at 140 (Sentelle, J., dissenting). This case and *Halverson*, however, are quite different. The two statutes at issue in *Halverson* regulated precisely the same secretarial function—delegation of authority. Obviously, the more specific statute controlled. But here, section 922(t)(2) and the two provisions relied on by the Attorney General concern entirely different functions. We thus have no reason to believe that section 922(t)(2)'s "assign," "provide," and "destroy" directives implicitly restrict the Attorney General's authority to implement sections 103(b) and 103(h).

The Supreme Court recently faced a similar situation in *Christensen v. Harris County*, —— U.S. ——, 120 S.Ct. 1655, 146 L.Ed.2d 621 (2000). There, county employees challenged a county policy requiring them to schedule paid leave as compensation for overtime in lieu of cash compensation. They argued that a provision of the Fair Labor Standards Act requiring that eligible employees be granted paid leave within a reasonable time of requesting it "provide[d] the exclusive means of utilizing accrued time." *Id.* at 1659. In other words, because the FLSA did not expressly allow employers to require leave in lieu of cash compensation, the employees argued, the County could not do so. The Supreme Court disagreed.

Acknowledging that "'[w]hen a statute limits a thing to be done in a particular mode, it includes a negative of any other mode,'" the Court found that the "thing to be done" by the relevant provision was not the same task accomplished by the challenged policy. *Id.* at 1660–61 (quoting *Raleigh & Gaston R. Co. v. Reid*, 13 Wall. 269, 270, 20 L.Ed. 570 (1872) (alteration in original)). The statutory provision does not "se[t] forth the exclusive method" of implementing FLSA's compensatory leave provisions; it is instead "more properly read as a minimal guarantee" that employees may receive compensatory leave upon request. *Id.* at 1661.

So too here. Section 922(t)(2) does not "set forth the exclusive method" by which the Attorney General may satisfy her statutory obligations; it is "more properly read as a minimal guarantee" that transaction numbers will be provided for approved transfers and that records relating to those transfers will be destroyed. *Id.* at 1661. This the Attorney General has done. As to our dissenting colleague's discussion of *Christensen*, we do not rely on the case for the proposition that "legislative silence empowered a federal agency to act." Op. at 141 n. 1 (Sentelle, J., dissenting); *see supra* at 129, 131–32, 136.

To sum up, keeping in mind *Chevron* two's highly deferential standard, we find that the Audit Log regulation represents a "permissible construction" of sections 103(b) and 103(h). *Chevron*, 467 U.S. at 843, 104 S.Ct. 2778. We think it "common sense"—*Brown & Williamson*'s *Chevron* one words that seem equally applicable at *Chevron* two—that Congress, having directed the Attorney General to establish a system for preventing disqualified persons from purchasing firearms, would expect the Attorney General to ensure that the system produces accurate information and guards against misuse. Indeed, by limiting retention of NICS information to "the minimum reasonable period for performing audits on the system," the Attorney General has obeyed the "destroy" command of

section 922(t)(2)(C) while fulfilling her section 103(b) and 103(h) responsibilities. *NICS Regulation,* 63 Fed.Reg. at 58304.

### IV.

■ We turn to the NRA's final argument: that the Attorney General has improperly exempted state agencies from the Brady Act's record destruction requirement. Because state and local agencies may serve as "points of contact" (POCs) for the purpose of processing NICS queries, *see* 28 C.F.R. § 25.2, gun dealers in POC states must submit NICS inquiries to the relevant state agency, not to the FBI. *See id.* § 25.6(d).

The Attorney General has determined that the Brady Act's destruction requirement does not apply to information retained by state governments that is "part of a record system created and maintained pursuant to independent state law." *Id.* § 25.9(d)(1), (d)(2). The NRA argues that the Attorney General lacks authority to create this exemption. But because "[t]he NRA does not contend that states may not have their own background check systems (with their own record destruction or retention requirements) or that federal law preempts state law on this subject," Appellants' Reply Br. at 16, we understand the NRA to be claiming only that the Attorney General has no authority to exempt POCs from the Brady Act's destruction requirement with regard to information *not* maintained pursuant to state law.

If the regulation permitted retention of data not gathered pursuant to state law, we would agree with the NRA that it would violate the Brady Act's destruction requirement. But that is not how the Attorney General interprets the regulation. As she sees it, the regulation merely clarifies that state record retention requirements are not preempted by federal law:

> The reason for this clarification is to avoid interfering with state regulation of firearms. If a state is performing a gun eligibility check under state law, and state law requires or allows the retention of the records of those checks, the state's retention of records of the concurrent performance of a NICS check would not add any more information about gun ownership than the state already retains under its own law.

*NICS Regulation,* 63 Fed.Reg. at 58304. So long as the Attorney General interprets the regulation as permitting POCs to retain only data that would be kept pursuant to state law, the regulation does not conflict with the Brady Act. *See Buffalo Crushed Stone, Inc. v. Surface Transp. Bd.,* 194 F.3d 125, 128 (D.C.Cir.1999) ("An agency's interpretation of its own regulation merits even greater deference than its interpretation of the statute that it administers.").

The judgment of the district court is affirmed.

*So ordered.*

SENTELLE, Circuit Judge, dissenting:

In 1993, as part of the Brady Handgun Violence Prevention Act, Pub.L. No. 103–159, 107 Stat. 1536 (1993) ("Brady Act"), Congress empowered the Attorney General to "establish a national instant criminal background check system" ("NICS") for determining whether purchasers of firearms from federal licensees are lawfully entitled to make such purchases. *Id.* § 103(b), 107 Stat. at 1541. Under the authorizing statute, with respect to legal transfers of firearms, the "system" initiated by the Attorney General is to "(A) assign a unique identification number to the transfer; (B) provide the licensee with the number; and (C) destroy all records of the system with respect to the call (other than the identifying number and the date the number was assigned) and all records of the system relating to the person or the transfer." 18 U.S.C. § 922(t)(2) (1994). In purported reliance on the statutory provision, the Attorney General has promulgated regulations which require the Federal Bureau of Investigation ("FBI") to

maintain an automated audit log of all incoming and outgoing transactions passing through the system including records of the "type of transaction . . ., line number, time, date of inquiry, header, message key, ORI [originating agency identification number], and inquiry/response data (including the name and other identifying information about the prospective transferee and the NTN [NICS transaction number])," *inter alia.* 28 C.F.R. § 25.9(b)(1) (1999). In the case of lawful transfers, the regulations require the FBI to retain such records in the audit log for six months after the date of each such transfer. *See id.* The National Rifle Association, the Law Enforcement Alliance of America, and various John and Jane Does (collectively "the NRA") sued to enjoin the operation of these regulations. The District Court granted summary judgment in favor of the Attorney General. Because the Attorney General in the promulgation of these regulations has not only exceeded the authority granted her under the cited section of the statute, but has also violated express prohibitions of other statutory sections, I would reverse.

### I. *Statutory Authorization*

The Attorney General's authority to deal with the subject matter of preclearance of handgun purchasers depends entirely upon congressional grant. She does not and cannot claim any inherent power over the subject matter from constitutional or other sources. Therefore, unless the Brady Act empowers her to do what she has done, the regulations are invalid. *Cf. American Petroleum Inst. v. United States Envtl. Protection Agency,* 52 F.3d 1113, 1119–20 (D.C.Cir.1995) ("*API*"); *Railway Labor Executives' Ass'n v. National Mediation Bd.,* 29 F.3d 655, 670–71 (D.C.Cir.1994) (en banc). The statute is unambiguously limited in the extent of the grant of authority to the Attorney General, and authority to be delegated to the NICS over transfers to citizens lawfully entitled to receive firearms. That authority is set forth in 18 U.S.C. § 922(t)(2) which, as expressed above, requires that the NICS "*shall* . . . assign a unique identification number . . . [;] provide the licensee with the number; and . . . destroy all records of the system with respect to the call (other than [the assigned number and the date])" along with "all records of the system relating to the person or the transfer." 18 U.S.C. § 922(t)(2) (emphasis added). Nothing in the Brady Act empowers the Attorney General to do more than these three things with respect to lawful transfers of firearms: (1) assign, (2) provide, and (3) destroy. When she, or the system to which she has delegated the authority, adds to those three by retaining instead of destroying, she and the system exceed the statutory grant of authority. The regulation requiring the retention in the "audit log" is such an excess; it is unlawful; and it should be enjoined.

The Attorney General's claimed authority for her unlawful accretion of power to the FBI and the NICS in the regulation is her "responsibility for administering the National Instant Criminal Background Check system." Br. for Appellee at 11. This reliance on general authority to administer an area of statutory regulation cannot sustain a federal actor's reaching beyond congressionally granted authority. We have repeatedly held that federal agencies cannot seize additional powers by substituting their own determination of the appropriate means for accomplishing statutory goals in place of that determined by the Congress.

For example, in *API,* the Environmental Protection Agency had been empowered by Congress to promulgate regulations for reformulated gasoline for use in "nonattainment areas." *See* 52 F.3d at 1115 (quoting 42 U.S.C. § 7545(k)(1) (1988 & Supp. V 1993)). The empowering statute provided that the regulations were to "require the greatest reduction in emissions of ozone forming volatile organic compounds . . ., taking into consideration the cost of achieving such emission reductions,

any nonair-quality and other air-quality related health and environmental impacts and energy requirements." 42 U.S.C. § 7545(k)(1). The EPA included in its regulations the mandate for the inclusion of "renewable oxygenates" in the reformulated gasoline. As justification for this additional assertion of regulatory authority EPA asserted its duty to achieve other goals under the Clean Air Act. We struck down the challenged regulations, holding that the broad general grant of authority did not "authorize EPA to mandate the manner of compliance or the precise formula for compliance without additional explicit authority." *API*, 52 F.3d at 1121. Just so here. Congress has explicitly authorized the Attorney General to regulate the activities of citizens in a certain fashion. Her general authority to administer the statutory programs created by the Brady Act do not empower her to take on additional powers over citizens not delegated to her by the legislature.

Also, in *Halverson v. Slater*, 129 F.3d 180 (D.C.Cir.1997), we considered the claimed authority of the Secretary of the Department of Transportation to delegate certain responsibilities under the Great Lakes Pilotage Act of 1960, 46 U.S.C. § 9301 *et seq.*, to the St. Lawrence Seaway Development Corporation. By statute, the Secretary was empowered to "delegate the duties and powers conferred by [the relevant] subtitle to any officer, employee, or member of the Coast Guard...." 46 U.S.C. § 2104(a) (1994). That statute did not empower the Secretary to delegate such duties and powers to anyone outside the Coast Guard. The Secretary relied upon a general delegation grant in 49 U.S.C. § 322(b) to assert the authority to delegate that power to any officer or employee of the department. Once more, we held that general statutory goals and grants cannot "override the limiting language" of a statute specifically empowering a federal agency to act. *Halverson*, 129 F.3d at 186, 187. Again, in the present controversy, we have before us a statute conferring specific powers upon a cabinet officer (the Attorney General), and an agency (the NICS) under that officer. General goals cannot add limitless power to the limited power delegated by Congress.

The Attorney General attempts to bolster her claim of power beyond the statutory grant by a repair to the analytical framework of *Chevron U.S.A. Inc. v. Natural Resources Defense Council, Inc.*, 467 U.S. 837, 104 S.Ct. 2778, 81 L.Ed.2d 694 (1984). Under the familiar rubric of that decision, when we review an agency's interpretation of a statute entrusted to the agency's administration, we undertake a two step analysis. We first "determine whether Congress has spoken to the precise question at issue." *Halverson*, 129 F.3d at 184 (quoting *Natural Resources Defense Council, Inc. v. Browner*, 57 F.3d 1122, 1125 (D.C.Cir.1995) (applying *Chevron*)). If so "that interpretation must be given effect." *Id.* If not, that is, "[i]f ... the statute is silent or ambiguous with respect to the specific issue, then the court will defer to a permissible agency construction of the statute." *Id.* The Attorney General contends that, under the second step of *Chevron*, we should uphold her assertion of the power to establish and retain records on lawful conduct of citizens where the words of the statute do not grant that power on the theory that her interpretation of the statute is a permissible one, that is to say a reasonable one. In fact, however, we should not even reach the second stage of *Chevron*. The absence of a grant of statutory power is not an ambiguity or silence on the question of whether Congress has granted such a power. We have disposed of that line of argument repeatedly in the past. As we stated in *Railway Labor Executives' Association*:

> To suggest, as the [government actor] effectively does, that *Chevron* step two is implicated any time a statute does not expressly *negate* the existence of a claimed administrative power (*i.e.* when the statute is not written in 'thou shall not' terms), is both flatly unfaithful to

the principles of administrative law ... and refuted by precedent.... Were courts to *presume* a delegation of power absent an express *withholding* of such power, agencies would enjoy virtually limitless hegemony, a result plainly out of keeping with *Chevron* and quite likely with the Constitution as well.

29 F.3d at 671 (citations omitted); *see also Natural Resources Defense Council v. Reilly*, 983 F.2d 259, 266 (D.C.Cir.1993) ("[I]t is only legislative *intent to delegate* such authority that entitles an agency to advance its own statutory construction for review under the deferential second prong of *Chevron*.") (emphasis added) (quoting *Kansas City v. Department of Housing and Urban Dev.*, 923 F.2d 188, 191–92 (D.C.Cir.1991)); *API*, 52 F.3d at 1120.[1]

The statute is not ambiguous on whether it grants the Attorney General the power to retain the records which the statute empowers her to destroy. The statute simply does not grant her that power. Indeed, the denial of power is even stronger than that considered in the cited cases. Those statutes did not include "thou shall not" provisions. The Brady Act does. In the cases discussed above, the federal agency was seizing power not granted by Congress. Here, the Attorney General is not only making such an unauthorized power grab, but is taking action expressly forbidden by Congress.

II. *"Thou Shall Not"*

The Brady Act contains an express provision headed "Prohibition Relating to Establishment of Registration Systems with Respect to Firearms." Pub.L. No. 103–159, § 103(i), 107 Stat. at 1542. That section provides that

No department, agency, officer, or employee of the United States may—

(1) require that any record or portion thereof generated by the system established under this section be recorded at or transferred to a facility owned, managed, or controlled by the United States or any State or political subdivision thereof....

*Id.* By its clear words, this statute establishes that Congress has unambiguously told the Attorney General that she shall not do what she is doing in the regulations. That is, she is forbidden to require the FBI, the NICS, or any other department, agency, officer, or employee of the United States to require that records generated by the NICS be recorded at or transferred to any facility. There is no exception for an audit log, and there is no exception for a six-month grace period. Congress has simply forbidden her to do it. She is doing it anyway. The regulation must fall. There is no ambiguity calling for the invocation of *Chevron*.

The Attorney General argues that "[w]ithout an audit log, the FBI would simply be incapable of achieving the level of oversight deemed essential by the Attorney General." Br. for Appellee at 17. I fail to see the relevance of that argument. Congress, not the Attorney General, makes the laws. Congress did not authorize the maintenance of an audit log in violation of its explicit command not to retain records. Neither did it empower the Attorney General to take its place in the making of law any time she deems essential a level of oversight neither required nor permitted by statute.

1. *Christensen v. Harris County*, —— U.S. ——, 120 S.Ct. 1655, 146 L.Ed.2d 621 (2000), cited by the majority, is not to the contrary. Indeed, the majority's analysis turns *Christensen* on its head. The Supreme Court not only did not decide that legislative silence empowered a federal agency to act, it did quite the opposite. The County, whose ability to control leave time scheduling was in question, appeared before the Court as the regulated entity asserting a limitation on federal power, not as the federal actor asserting a grant of power. *See id.* at 1659. Because the statute in question was silent or ambiguous on the issue, the regulated entity did not lose an ability that was inherently its own. *See id.* at 1660–62. That is, the silent or ambiguous statute did not empower the federal actor to do that which was not expressly forbidden to it. Just so here.

**142**

### III. Conclusion

The Attorney General's ultimate fallback argument is that Congress and the statute could have but did not include the adverb "immediately" before the verb "destroy" when it commanded her to "destroy all records of the system" with respect to the contact in the case of lawful transfers of firearms. 18 U.S.C. § 922(t)(2). Specifically, she notes that it did not adopt an amendment offered in the House of Representatives to the effect of including that word. I fail to see that this avails her anything. Courts are reluctant "to draw inferences from Congress' failure to act," *Schneidewind v. ANR Pipeline Co.*, 485 U.S. 293, 306, 108 S.Ct. 1145, 99 L.Ed.2d 316 (1988). In no case has a court held that power has been granted to a federal agency by Congress's failure to enact a limitation to a directly contradictory statutory command. Congress said, "destroy all records." Congress said, do not "require that any record ... be recorded." Brady Act § 103(i), 107 Stat. at 1542. The Attorney General asserts, "Congress did not say that I have to destroy the records *immediately*. Therefore I am empowered to retain the records." The Attorney General's position strikes me as reminiscent of a petulant child pulling her sister's hair. Her mother tells her, "Don't pull the baby's hair." The child says, "All right, Mama," but again pulls the infant's hair. Her defense is, "Mama, you didn't say I had to stop right now."

I do not think that the parent's command to the child is ambiguous, nor that of Congress to the Attorney General. I do not find the child's response reasonable; nor is that of the Attorney General.

I respectfully dissent from the decision of my colleagues to uphold the Attorney General's regulations.